UNITED STATES, Appellant and Cross-Appellee

v.

MELVIN B. VOORHEES, Lieutenant Colonel, U. S. Army,
Appellee and Cross-Appellant

4 USCMA 509, 16 CMR 83

510

511

512

514

No. 3226

Decided July 9, 1954

Lt Col William R. Ward, U. S. Army, Maj Irvin M. Kent, U. S. Army, and 1st Lt Roderick V. Brown, U. S. Army, for Appellant and Cross-Appellee.

Lt Col James C. Hamilton, U. S. Army, Capt William C. Irby, Jr., U. S. Army, and 1st Lt Paul Berger, U. S. Army, for Appellee and Cross-Appellant.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

The accused was convicted by general court-martial at Fort George G. Meade, Maryland, of five violations of the Uniform Code of Military Justice which grew out of certain of his writings regarding his experiences in Korea. A divided board of review set aside all of the findings of guilty except that relating to a single offense. However, it affirmed the sentence of dismissal and total forfeitures as appropriate for the finding affirmed. The dissenting member of the board voted to dismiss all findings of guilty. The Acting The Judge Advocate General certified to this Court a number of questions concerning the board of review's action, and we granted the accused's petition for review to consider other issues. For a proper perspective, preliminary consideration of the evidence is required.

In December 1951, the publishing firm of Simon and Schuster accepted for publication a manuscript written by the accused, who was then in Korea. A formal contract was entered into by the publishers and the accused's spouse, who acted under a power of attorney from him. The manuscript, bearing the title "This Is How It Was," but later published as "Korean Tales," consisted of two kinds of material, one fictional and the other factual. On instructions from the accused, Simon and Schuster mailed the factual chapters, on March 4, 1952, to the Office of Public Information, Department of the Army, "for review." Although addressed as indicated, the manuscript reached the Security Review Branch, Office of Public Information, Department of Defense. That branch sent it to the Office of Chief of Information, the reviewing authority for the Department of the Army. About a week later, a member of the staff turned over the manuscript to Brigadier General Dorn, Deputy Chief of Information, with the recommendation that he examine two of the chapters, one entitled "The Generals" and the other, "The Press." These chapters were admitted into evidence. Nothing appears in the record regarding the other factual chapters, except that one concerned the Air Force and that it was cleared for publication by that service.

After reading the critical chapters, General Dorn concluded that certain portions of the chapters violated "policy" and "propriety" requirements of Army Regulations 360–5. Among the portions to which specific objection was made by General Dorn was the following:

"Little did Hodes or the censors know that as he spoke a news story was being filed at the censors' office which, from the standpoint of Eighth Army, represented one of the most serious breaches of security to occur during the war—and that its source was none other than the United Nations' Supreme Commander, General of the Army Douglas MacArthur.

. . . . . .

"When the 'pooled' press account of General MacArthur's revelations was laid on the censor's desk, the censor faced a dilemma. Here was a news story which should be suppressed for security reasons, even though it emanated from a general officer; yet it came from the one officer who possessed the undoubted authority to make any statement regarding military operations he chose. The censor passed the unembellished MacArthur statement as a direct quotation about 3 p. m.

. . . . . .

". . . The next day, February 22, General MacArthur, from Tokyo, issued without warning his Communique No 802, which told the world Eighth Army was about to strike. The communique 'broke' Eighth Army's security news blackout after it had been in effect (without protest from newsmen, who well understood its efficacy) for 23½ hours. It was the first communique GHQ had issued since January 11, when GHQ had announced it would allow Eighth Army to be the sole source of ground combat information, and it was typically MacArthurian in phraseology, scope and grandiloquence.

"Be all that as it may, GHQ had telegraphed Eighth Army's punch.

. . . . . .

"Heavy rains swept Korea now and four days later the offensive had bogged down. No one will ever know what portion of this temporary failure should be charged to inclement weather and how much to the disclosure of the army's intention."

On completing his examination, General Dorn gave the manuscript to Major V. Pizer, Chief of the Book and Magazine Branch of his office, for further review. Thereafter, a series of letters passed between General Dorn and Simon and Schuster. General Dorn advised the publishers that the crucial chapters could "be edited and revised so as to be acceptable to the Army," although in so doing, the "manuscript might reach a point where . . . [they] would not wish to bring it out." He also indicated that the best way to accomplish the revision was to review the material with the accused, who was due to return to the United States.

No further activity of importance took place until April 1952. About the middle of that month, the accused's literary agent sent a carbon copy of "The Generals" chapter to Argosy Magazine. After acceptance of the manuscript, Argosy's Managing Editor received from Simon and Schuster a photostat of the original in which the accused had made a number of editorial corrections. The corrected chapter appeared as an article in the October 1952 issue of Argosy Magazine under the title, "The Generals' Private War."

After submission of "The Generals" chapter to Argosy Magazine, but before its publication, the accused actually met with General Dorn for consideration of revision of the text of the objectionable chapters. In late April or early May 1952, the accused appeared at General Dorn's office at the Pentagon and had two conferences with him and Major Pizer. These conferences were supplemented by three or four days of discussion of a "completely specific nature" between Major Pizer and the accused. While these discussions were going on, General Dorn wrote to Mr. Peter Schwed of Simon and Schuster, on May 1, 1952, advising him of the discussions. In his letter General Dorn said: "since security matters are scarcely involved in this manuscript, I feel that a satisfactory revision can be achieved."

At the end of the three or four-day period of talks, a number of open questions remained. The accused left the Pentagon, taking the whole manuscript with him. Major Pizer understood that he was going to prepare "a clean copy [of the critical chapters] which would incorporate all the changes . . . agreed upon following which he would have submitted it for clearance." However, the manuscript was not returned, and the Office of Chief of Information, Department of Army, never regarded it as cleared. It appears that after the accused left Major Pizer, he went to the office of Simon and Schuster. There he talked with Mr. Schwed. He told him of his consultations at the Pentagon. He said, too, that he "could not go with all the things they requested of him." The accused had the manuscript and "the next day or so" remained in New York working on it. Eventually, he left the corrected manuscript with Mr. Schwed, and departed for his home on the West Coast.

Neither Simon and Schuster nor Argosy Magazine appear to have been specifically authorized by the accused to publish their respective manuscripts prior to accused's appearance at the Pentagon. The record is not clear as to when Argosy Magazine was authorized to proceed, but its publication arrangements were probably completed shortly after the accused made the changes in text in May 1952. In any event, on June 18, 1952, the accused wrote to the secretary of Argosy's Managing Editor expressing concern "over the proofs" of the article. He also stated that he "must be assured [they] were working from copy as finally edited by Simon and Schuster and himself." As for the book itself, Simon and Schuster went into preliminary production upon receipt of a letter from the accused dated June 20, 1952.

Enclosed with the June 20th letter to Simon and Schuster was a copy of a letter sent by the accused to the Office of Chief of Information, Department of Army. In the enclosure, the accused referred to his efforts to obtain a satisfactory revision of the manuscript and to his conviction that "individual personal reactions were the governing factors" in the official determination of "propriety." He said that he regretfully could not comply with "such restrictive interpretation," and that he had authorized Simon and Schuster to proceed with publication. He also stated his belief that the manuscript would reflect favorably upon the Army, because that end "was at all times one of the author's purposes."

Official reaction to the accused's letter to the Office of Chief of Information came in the form of a letter from General Dorn to the Commanding General, Sixth Army, the accused then being a member of that command. This letter, dated July 3, 1952, reviewed the submission of the manuscript for clearance, recited a number of alleged violations in the text of "policy" and "propriety"

requirements of AR–360–5 and implementing directives, enclosed a copy of accused's letter of June 20 to Simon and Schuster, and concluded by referring the matter "for such action as . . . may [be] deem[ed] appropriate." The contents of this letter were duly brought to the attention of Lt. General Swing, the Commanding General of Sixth Army.

At General Swing's direction, a letter, dated July 11, 1952, addressed to the accused, and signed "by command of Lt. General Swing," was prepared. The letter reads as follows:

"1. The Commanding General has been informed that you have submitted a manuscript for intended publication to one or more publishers without obtaining prior Army clearance, in contravention of the provisions of paragraph 15, AR 360–5.

"2. You are hereby directed to withdraw immediately your manuscript from all publishers and to comply with the mentioned regulations by withholding it and all parts of it from publication until it has received clearance from the appropriate security review authority, which, in this case, is the office of the Chief of Information, Department of the Army.

"3. You will acknowledge receipt of this communication by indorsement through proper channels, and you will state therein the action taken by you to comply with this order.

BY COMMAND OF
LIEUTENANT GENERAL SWING:"

On July 14, 1952, it was personally delivered to the accused. By endorsement, the accused acknowledged receipt and, in part, said:

"2. Respectfully advise I cannot comply with order.

"3. Desire to point out that manuscript in question was submitted to publisher while I was on duty in Korea, that I immediately wired and wrote him order to submit it to Department of the Army, that he complied at once, and that all complete chapters in question were in hands of Department of the Army not less than six weeks before publisher was permitted by me to proceed.

"4. Request permission to return to my home station to obtain pertinent correspondence and affidavits, in order to adequately prepare for any possible inquiry."

A week later in a letter to Mr. Schwed of Simon and Schuster, the accused said: "My battle with the Army now is joined in earnest. At headquarters Sixth Army I was ordered to recover the manuscript from you and halt publication. This, of course, I refused to do. Charges then were filed, with Dorn listed as witness against me. I told the Army I intended to fight all the way."

Two of the five charges upon which the accused, eventually, was brought to trial had, in fact, been prepared. The first alleged a willful disobedience of General Swing's command (Charge I), and the second charged a violation of paragraph 15, AR–360–5, in the submission of a manuscript to Simon and Schuster on June 15, 1952, without obtaining prior Army clearance (Charge II). Both charges were investigated and recommended for trial by general court-martial. However, General Swing referred the charges to The Adjutant General "in view of the fact that [he was] the nominal accuser in this case." By appropriate endorsement, the Commanding General, Second Army, was designated as the authority to exercise jurisdiction. Colonel Voorhees was then transferred to that Command.

Before further action was taken on the original charges, a third was added (Additional Charge). This charge resulted from the appearance of the October 1952 issue of Argosy Magazine containing "The Generals' Private War," which was "identical" with the corrected copy of the chapter, "The Generals." In substance, the specification of the charge alleged that the accused violated paragraph 15, AR–360–5, on June 20, 1952, by knowingly submitting a manuscript to the publishers of Argosy, without prior Army clearance. The three Charges were referred to trial on November 17, 1952, but be-

fore they came on for hearing, two more were appended.

In December 1952, the New York Journal-American, a New York City newspaper, planned a series of articles based upon the accused's book. To bring the material up to date, Mr. Guy Richards, who was in charge of the preparation of the series, urged the accused to "wind up his series with . . . a few expressions of opinion . . . about the solution of the so-called Korean problem." Acceding to the urgings, the accused wrote two articles. On December 15, 1952, at the insistence of Mr. Richards, these were mailed for clearance directly to the Security Review Branch, Department of Defense. The next day the accused mailed copies of the articles to Mr. Richards, with a note reminding him that clearance had to be obtained. No clearance on these articles was obtained and they were never published. Instead, Major General Parks, Chief of the Office of Information, Department of the Army, procured their return to accused for retransmission through regular Army channels. Additional Charge I and Additional Charge II were then filed against the accused. Additional Charge I alleges a violation of paragraph 15, AR-360-5, in that the accused submitted two articles to the publishers of the New York Journal-American, without obtaining prior Army clearance. Additional Charge II alleges that the accused wrongfully submitted the articles directly to the Department of Defense instead of through Army channels, in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728.

A great deal of other evidence was presented at the trial; much of it is documentary. Included among the exhibits are a memorandum, dated June 7, 1949, by the Secretary of Defense, Louis Johnson, which is addressed to the secretaries of the services and relates to the review of manuscripts written by military personnel, and a memorandum dated December 5, 1950, from the President of the United States to the various heads of executive departments and agencies, which concerns public statements on foreign or military policy of officials of the departments and agencies of the executive branch. The Johnson memorandum provided that:

"The responsibility of public information officers, including the Office of Public Information of the National Military Establishment, for the review of manuscripts or other material submitted in accordance with Army, Navy, and Air Force regulations is limited to deletion of matter which is classified for security reasons.

"It is directed that all Army, Navy, and Air Force regulations, directives, letters and memoranda which are in conflict be changed to conform with these instructions."

President Truman's memorandum reads as follows:

"In the light of the present critical international situation, and until further written notice from me, I wish that each one of you would take immediate steps to reduce the number of public speeches pertaining to foreign or military policy made by officials of the departments and agencies of the Executive Branch. This applies to officials in the field as well as those in Washington.

. . . . . .

"No speech, press release, or other public statement concerning military policy should be released until it has received clearance from the Department of Defense.

. . . . . .

"The purpose of this memorandum is not to curtail the flow of information to the American people, but rather to insure that the information made public is accurate and fully in accord with the policies of the United States Government."

Before his plea, at the end of the prosecution's case, and again at the close of his own case, the accused made various motions to dismiss all the charges. These were denied. The defense consisted primarily of oral and documentary evidence regarding the meaning and applicability of AR-360-5. Considerable evidence was also elicited on the proper procedure for review of manuscripts written by military per-

sonnel. The accused himself did not testify.

The accused was convicted of all five of the charges. On review, the board of review set aside all the findings of guilty except those relating to Additional Charge I which concerned the Journal-American articles. Thereupon, The Acting The Judge Advocate General certified a number of questions to this Court. Also, the accused petitioned for a grant of review and we granted the petition to a limited extent. For convenience, the certified questions and the petition issues are consolidated as follows:

(1) Whether the Army can constitutionally require a "propriety" and "conformance to policy" clearance, prior to submission of a manuscript by military personnel to a publisher; if it can, may it properly impose such requirements in view of the terms of the Johnson memorandum of June 7, 1949, and President Truman's memorandum of December 5, 1950.

(2) Does AR-360-5 establish such a requirement of clearance of manuscripts and impose a duty of compliance upon Army personnel?

(3) Was the order of Lt. General Swing (Charge I) a lawful order?

(4) Did redelivery by the accused of a portion of his manuscript to Simon and Schuster about June 1952, (Charge II), constitute a "submission" within the meaning of paragraph 15, AR-360-5?

All the issues are closely connected. Common to each is AR-360-5. Accordingly we focus our attention first on the legality of that regulation.

AR-360-5 is entitled "Public Information, General Policies." Under Section IV, Army personnel are encouraged to write for publication on topics of general interest concerning the Army, within the bounds of security and Department of Army policy. Ibid, paragraph 13a. Personnel engaged in public information work, as was the accused, are expressly authorized to "engage in private literary efforts of their own." Ibid, paragraph 13b. A number of other provisions are of importance to the issues in this case, but of immediate significance is paragraph 15. Since a violation of that paragraph is alleged in four of the five charges against the accused, we set it out in full.

"15. Submission of material for review.—a. Each individual subject to military law is responsible that disclosure by him to the public of material or information shall conform to applicable regulations on classified matters.

"b. Public information officers normally perform the duties of security review. This function is limited to the deletion of classified matter and review for accuracy, propriety, and conformance to policy. Specific violations of security directives, policies, or regulations will be brought to the attention of the person submitting material for review.

"c. Personnel of the Army Establishment are personally responsible for their writings and public statements. Personnel on active duty will submit their writings and public statements to the appropriate security review authority. Retired personnel and civilian personnel employed by the Army Establishment will submit their writings and public statements to the appropriate security review authority when the material concerns military subjects. In no instance should the material be submitted to a publisher prior to clearance. Civilian component personnel who have written material intended for public release which concerns military subjects should submit the material to appropriate security review authority when there is any doubt concerning its security or propriety.

"d. Commanders will not impose restrictions other than to prevent public disclosure of classified or erroneous information.

"e. Commanders of highly classified projects or agencies in which highly classified information is processed should require a security review of

all material prepared by their subordinates for public release."

Plainly AR-360-5 imposes restrictions on the free expression of ideas by Army personnel. The question then is whether those limitations set out in the regulation constitute an illegal departure from the Constitutional prohibition on legislation "abridging the freedom of speech," which is contained in the First Amendment.

The right to free speech is not an indiscriminate right. Instead, it is qualified by the requirements of reasonableness in relation to time, place, and circumstance. Schenck v. United States, 249 US 47, 63 L ed 470, 39 S Ct 247. Thus, there is no doubt that restraints which reasonably protect the national interest do not violate the Constitutional right of free speech. See Dennis v. United States, 341 US 494, 95 L ed 1137, 71 S Ct 857. With these principles for our frame of reference, we proceed to inquire into the legality of the regulation.

At the outset, we face the necessity of determining the scope of the restrictions included in the regulation. The Government contends that the limitations are three-fold: security, policy, and propriety. On the other hand the accused maintains, and the board of review has held, that the only restraint is that of conformance to the demands of security. Resolution of the conflict cannot come from a dogmatic preference for one or the other. We must interpret the regulation reasonably and realistically. And our path of approach is marked out in the Manual provision that, "A general order or regulation is lawful if not contrary to or forbidden by the Constitution, . . . an Act of Congress or the lawful order of a superior authority." Manual for Courts-Martial, United States, 1951, paragraph 171a. This statement is consistent with general law. Standard Oil of California v. Johnson, 316 US 481, 86 L ed 1611, 62 S Ct 1168; United States v. Rosato, 3 USCMA 143, 11 CMR 143. Consequently, our immediate concern in determining the scope of the regulation is whether it is con-

trary to the order of a superior authority. If it is, at least to the extent of the conflict, we need not go beyond that class of authority in determining the legality of the regulation.

Prior to enactment of the National Security Act of 1947, the Secretary of War was empowered to prescribe regulations for the government of the Army. Revised Statutes, §§ 158–161. Under the National Security Act, the Secretary of War was designated as Secretary of the Army, and the Department of the Army was expressly made subject to the "general direction, authority, and control" of the newly created Secretary of Defense. 5 USC § 201, et seq. That was the state of the law when Secretary of Defense Louis Johnson issued his June 7, 1949, memorandum to the service secretaries.

Later, Congress rearranged the military establishment by substituting the Department of Defense as a single Executive Department in the Cabinet in place of the several service departments. 5 USC § 171. This change did not alter the subordination of the Department of the Army to the Secretary of Defense. Senate Report 366, 81st Congress, 1st Session (1949). On September 26, 1950, the then Secretary of Defense, General George C. Marshall, specifically continued in effect all previous memoranda and directives of the Secretary of Defense, to the extent that they remained unmodified by appropriate authority. From the record, briefs of counsel, and our own research, it appears that the Johnson memorandum was never rescinded or modified by a Secretary of Defense up to the time of the offenses herein.

No one contends that the Johnson memorandum is an unconstitutional abridgement of freedom of speech. Any such attack would certainly fail. Dennis v. United States, supra; Schenck v. United States, supra. Similarly, no attack is made on the memorandum as being contrary to any presidential directive at the time of its issuance. In the absence of a contrary showing, we must presume its legality, insofar as it may be affected by a Presidential order as "the order of a superior author-

ity." See: 5 USC § 171(b). However, the Government urges that ■ a literal interpretation of the provision that review is limited "to determination of matter which is classified for security reasons" would be violative of the Articles of War and the current Uniform Code of Military Justice. According to the Government, the quoted phrase is intended to cover review of matter violative of law generally, in addition to matter classified for security. Such construction is contrary to the plain language of the memorandum. Nonetheless, the Government contends that a different interpretation would be unconscionable and illegal in that a reviewer who limited his review to classified security matters alone would subject himself to criminal liability under military law by failing to exercise preventive discipline. This argument overlooks the right of a reviewing officer to bring a violation of law to the attention of the appropriate authorities, and thereby meet all of his obligations for preventive discipline. Such action would be entirely consistent with the restriction on his right to delete matter from the manuscript. Therefore, we reject the Government's position, and we hold that the memorandum covers only matters which are classified for security reasons, and not those matters which may be generally violative of law. No other Congressional enactment having been suggested as possibly contrary to the memorandum, and since we are aware of none, we have no hesitancy in recognizing its validity in the statutory field.

Turning to the regulation, we consider first whether it conforms to the Johnson memorandum as the order of a superior authority. From the viewpoint of language, the regulation, if construed to include review for policy and propriety, would clearly go beyond the memorandum. The latter provides for deletion of material only if it is classified for security reasons. However, AR-360-5 refers in critical paragraph 15d to "the deletion of classified matters and review for accuracy, propriety, and conformance to policy." Unless we are to believe that the Secretary of the Army deliberately flouted the authority of his superior, the Secretary of Defense, we must seek some basis for reconciliation.

According to the testimony of Major General Parks, Chief of the Army's review office, the regulation was "not consonant with the policy instruction of the Secretary of Defense's Office at the time it was issued." General Parks had been directed by the Secretary of the Army to establish a branch to review "for propriety and facts," and while he did not know where the Secretary of the Army "obtained his authority . . . I would assume that he knew what he was doing." On the other hand, General Dorn's testimony intimates that, when his office drafted the regulation, consideration was given to the Presidential Directive of December 1950. Plainly, he was in error in this respect. The direction for preparation of the regulation came, according to General Parks, "shortly after" his return to the public information office in September 1949; also the regulation itself is dated October 20, 1950. However, we are not foreclosed by any of this testimony from making an independent examination of the question of conflict between the Johnson memorandum and the regulation. See: Burnet v. Chicago Portrait Co., 285 US 1, 76 L ed 587, 52 S Ct 275.

The memorandum was issued on June 7, 1949. Although in the form of a memorandum to the service secretaries, it was phrased in positive, mandatory language and we have no doubt that it was intended as an order. Shortly afterward, the Secretary of the Army, according to General Parks' testimony, directed the redrafting of the Army's regulation on review. Unfortunately, the record does not show, and we have been unable to determine, the exact nature of those instructions. However, some help in interpreting the meaning of the two instruments may be obtained from a brief consideration of previous directives.

On March 17, 1949, the then Secretary of Defense, Mr. James Forrestal, published a memorandum ■ addressed to the services which provided for the creation of an Office of Public Information

**522**

in the Department of Defense. It also provided that specified public information activities of the military establishment would operate on a consolidated basis under the Director of Public Information, who was placed in charge of the Office of Public Information. Among the enumerated activities was "security review and clearance of manuscripts." The memorandum was implemented by Consolidation Directive No. 1, April 14, 1949. This directive established the Security Review Branch in the Office of Public Information, Department of Defense. The mission and the functions of that branch were set out as follows:

"2. The mission of Security Review Branch is to establish safeguards for the National Military Establishment against the release by persons under its jurisdiction of classified military information or other matter which, if disclosed, would jeopardize the national security or welfare, and to facilitate the release of information which is in the public interest.

"3. The Departments of the National Military Establishment will submit to Security Review Branch all informational material originating within their jurisdiction which is subject to review as outlined below:

In the performance of its mission, Security Review Branch will:

a. Review for security, policy and propriety:

(1) Informational material of any nature, including material for use in press conference or interviews, and including books, magazine or newspaper articles, news releases, speeches, radio scripts, still and motion pictures, posters, drawings, maps, etc., from military sources, including individual military personnel, for public dissemination through any medium of public information.

(2) Informational material dealing with military matters prepared by retired military personnel for publication."

The purpose and language of the Consolidation Directive make it apparent that the words "policy and propriety" are not intended to have simply the dictionary meaning. Rather, they are limited examples of "other matter" which would jeopardize the national security or welfare. A different construction would obviously create a contradictory enlargement of the functions of the Security Review Branch, as it is set out in the preceding paragraph. We hardly think that the draftsman of the directive intended such conflict.

The Johnson memorandum, issued less than two months after Consolidation Directive No. 1, was obviously intended to limit the scope of the directive. It appears to us that Secretary Johnson sought to establish a clear-cut and easily applied basis of review. Under the Consolidation Directive, the determination of what matter would violate national welfare rested upon an uncertain formula which could be given varying constructions by each of the services. In fact, General Parks touched upon this factor, as applied to this case, when he said, "This is a very complex subject, this business of review and security and it gets into personal opinions which makes it so hard." However, under the Johnson standard, objectionable matter could be readily established as a fact by a relatively simple comparison with security classification directives. Thus, the standard for review in each of the services would be uniform and easily applied.

Read together, the Johnson memorandum and Consolidation Directive No. 1 give significance to the instruction of the Secretary of the Army to General Parks, at the time of the Army's implementation of the directives on manuscript review. General Parks testified that he was directed to establish a branch to review "propriety and facts." This direction does not impress us as an attempt by the Secretary of the Army to enlarge upon or circumvent the Department of Defense orders. On the contrary, the use of language appearing in the directive and the reference to "facts," which is the basis of the Johnson standard, suggest that the

**523**

Secretary of the Army was trying to formulate a directive which was consonant with that of the Secretary of Defense. An examination of AR-360-5, convinces us that he accomplished that purpose.

The entire emphasis of the Army regulation is on review for *classified* matter. At the very outset, the responsibility of the Army is stated as "ensuring that information . . . not of classified nature within the meaning of AR 380-5, is made available to the public." Paragraph 3a. Parenthetically, the cited regulation deals with the standards for, and types of classification of, material for security purposes. Coordination with other agencies for security is required. Paragraph 3c. Army commanders are made responsible "for the security review" of material submitted for publication. Paragraph 5c. The duty imposed upon the public information officer is "to review for security." Paragraph 10b(3)(c). Personnel on active duty are required to submit their writings and public statements to "appropriate security review authority." Paragraph 15c. Finally, under the regulation, commanders may not impose any restriction on the publication of material other than "to prevent public disclosure of classified or other erroneous information." Paragraph 15d.

The only portion of the regulation which seems to go beyond security is that part which reads as follows: "Public information officers normally perform the duties of security review. This function is limited to the deletion of classified matter and review for accuracy, propriety, and conformance to policy. Specific violations of security directives, policies, or regulations will be brought to the attention of the person submitting material for review." Paragraph 15a. Apparently, the words "propriety" and "policy" as used in the regulation are intended to have the same meaning given to them in the Consolidation Directive. Certainly, they appear as an identical description of the function of review by the Public Information Officer. This circumstance suggests that they were taken bodily from the Directive. Accordingly, we

see no reason to give them any meaning other than that which they had in the Consolidation Directive. Further support for this construction appears from examination of the internal composition of the regulation.

Under the regulation, public information is an important function of command. Paragraph 3. The commanding officer is specifically designated as the primary public information officer. Paragraph 10. Under it too, no commander may impose any restriction other than to prevent public disclosure of classified or erroneous information. It goes without saying that any prohibition applicable to a commander, in the exercise of his command function, is equally binding upon every member of his staff. Since the regulation expressly makes the public information officer a member of the commanding officer's staff, paragraph 10b, it follows that he cannot review for any purpose forbidden to the commanding officer. This limitation finds specific expression in that portion of the regulation defining the functions of the public information officer. Thus, his reviewing power is expressly limited to "review for security." Paragraph 10b(3). Further emphasis occurs in the first sentence of the crucial paragraph which provides that public information officers normally perform "the duty of security review." The second sentence would suddenly expand the scope of review if the words "and review for accuracy, propriety, and conformance to policy" are interpreted as relating to matters other than security. Such a construction would be entirely foreign to every part of the regulation that preceded it, and in direct conflict with the limitation imposed upon commanders. For these reasons alone, we would choose to look for a meaning in these words that can properly be connected with security, instead of treating them as separate and different subjects for review. In the light of the Johnson memorandum and the Consolidation Directive, only one construction seems reasonable and proper, namely, the words "accuracy, propriety, and conformance with policy" enter into the review process only as to matters which

may affect the national security and welfare and which are covered by a security classification.

Our construction of AR-360-5 eliminates consideration of a number of dependent issues. First, we need not consider whether the Army may properly require a "propriety" and "conformance to policy" review since it did not purport to do so under AR-360-5. Second, we may put aside all issues relating to the meaning and effect of President Truman's Memorandum of December 5, 1950. Since that memorandum was not in effect at the promulgation of AR-360-5, it could not have influenced the drafting of the regulation. Without any amendatory action by the Army, the original scope of the regulation remained unchanged. Third, we need not now decide whether clearance requirements for "propriety" and "conformance to policy," as distinct factors, would be constitutional. See District of Columbia v. Little, 339 US 1, 94 L ed 599, 70 S Ct 468; Addy Co. v. United States, 264 US 239, 68 L ed 658, 44 S Ct 300.

Having found that AR-360-5 does not, in fact, provide for a review on "policy" and "propriety," we may properly pass over the second consolidated issue which raises the question of whether the regulation imposes a duty on Army personnel to submit their writings for review on those points. However, in their respective briefs and on oral argument, the accused and the Government joined issue on the accused's claim that, irrespective of "policy" and "propriety" the regulation imposes no duty whatsoever in respect to the submission of manuscripts for review. This claim is outside the narrow scope of the certified questions █ and the limited issues on which we granted review. Nonetheless, it strikes at the validity of the findings of guilty of the single offense affirmed by the board of review. Under the circumstances, we think it appropriate to accept this enlargement of the question and pass on the accused's claim.

The board of review held that a duty was imposed upon military personnel to submit their writings to the Army for review before turning them over to a publisher. Accordingly, it affirmed the findings of guilty of Additional Charge I which related to the articles written for the New York Journal-American. The pertinent part of the regulation appears in paragraph 15c, and reads as follows:

"c. Personnel of the Army Establishment are personally responsible for their writings and public statements. Personnel on active duty will submit their writings and public statements to the appropriate security review authority. Retired personnel and civilian personnel employed by the Army Establishment will submit their writings and public statements to the appropriate security review authority when the material concerns military subjects. In no instance should the material be submitted to a publisher prior to clearance. Civilian component personnel who have written material intended for public release which concerns military subjects should submit the material to appropriate security review authority when there is any doubt concerning its security or propriety."

Accused's argument on this aspect of the case may be divided into two categories:

(1) The regulation fails to meet the standards required for a criminal statute in that it is vague, equivocal, and uncertain.

(2) The requirements for submission are permissive rather than mandatory; hence, the accused had no duty to submit his articles for clearance.

In elaboration of the first category, accused sets out portions of the regulation, and asks a great █ many questions which purport to show such a lack of clarity and certainty. His principal attack centers on the phrase "the appropriate security review authority," which appears in paragraph 15c; and his principal claim is that the phrase is so ambiguous as to have no meaning. Support is sought in an alleged conflict

between the testimony of General Parks and that of other witnesses who were experienced in review procedure. General Parks testified that the appropriate security review authority is an "Army headquarters or any public information headquarters." He also stated that the function of review was decentralized to Army commands, and only where there is "some doubt about the possibility of security" is the case referred to the Chief of Information. From the Office of the Chief of Information it goes to the Security Review Branch, Office of Public Information, Department of Defense, for final review and "stamping for clearance." A scrutiny of the record discloses no testimony by any other witness which describes a different procedure.

Five persons, other than General Parks, testified on some phase of the review procedure. Their testimony may briefly be summarized as follows: Lieutenant Colonel Missal, Jr., review officer in the Security Review Branch, stated that in March 1952, he received ten chapters of the accused's book from Simon and Schuster; he read the manuscript and forwarded it to the Army; he expected the manuscript to be returned by the Army, but it never was. Colonel Missal did not give any reason why he submitted the manuscript to the Army, but a probable explanation appears in the testimony of General Dorn. The General stated that, if a manuscript is sent directly to the Security Review Branch and "it is on an Army matter, normally they will refer it to us for our comments before they pass on the security." General Dorn also testified to the decentralization of review to major commands, and that an Army officer's manuscript is supposed to go through channels; after the Department of Defense completes the review, it normally returns the manuscript to the Army for transmission to the author; however, in a case involving a publication deadline, Defense would forward the manuscript directly to the author. The testimony of the third witness, Major Vernon Pizer, Chief of the Magazine and Book Branch, Office of the Chief of Public Information, Department of Army, did

not deal directly with review procedure as such, but in response to defense questioning on who could clear the manuscript, he said that the "simplest thing" for a writer to do was to go to "his public information officer"; if that officer was unable to provide a definitive answer, he could apply through channels to get "authoritative answers."

Substantially the same testimony came from two defense witnesses. Colonel J. S. Edgerton, Chief, Security Review Branch, Department of Defense, primarily testified to his own interpretation of the Army regulation in relation to the Johnson memorandum. In the course of his testimony, he stated that his office was the final review authority for security matters; the "standard procedure" was to submit manuscripts to the services for comment, but it was "an internal matter for the services" as to how material from military personnel would be forwarded to his office. Lieutenant Colonel Rathbun, Public Information Officer, Second Army, also testified for the defense. His testimony, like that of Colonel Edgerton, was mainly concerned with his construction and application of the regulation. He recounted instances in which he, as a public information officer, reviewed the writings of military personnel which were intended for publication; he conceded that his decisions could be overruled by "higher echelon of command." At least by clear implication, this testimony substantially conforms with that of the other witnesses. And, quite clearly substantial agreement on the process of review exists among all of the witnesses.

While elimination of the claim of conflict in testimony does not serve to dispose of accused's assertion that the regulation generally is vague and uncertain, it does serve to establish that in practical operation the phrase "an appropriate review authority" has definiteness of meaning. From the testimony, it is apparent that the public information officer of a command is the appropriate review authority for the military personnel of that command. The language of the regulation conveys the same meaning.

526

The responsibility for insuring that no classified matter is made available to the public "extends to all echelons to include all individuals." Paragraph 3; paragraph 15a. As we have already noted, security review is an important function of command, and the commanding officer is designated as the primary public information officer of any activity or command of the Army. Paragraph 3; paragraph 10. These provisions are followed by the requirement of submission to the appropriate security review authority. The wording of these provisions and the sequence in which they appear, lead inexorably to the conclusion that the commanding officer, or his public information officer, if he has one, is the proper review authority. Consequently, we find no vagueness or uncertainty in this part of the regulation.

Disposition of this portion of the accused's claim of uncertainty disposes of a number of subsidiary ▮ contentions. Among these is a claim that the regulation does not grant a right of review to the Army. Such a duty of review is clearly imposed upon the Army by the regulation. Paragraph 3 provides: "The United States Army is responsible for ensuring that information concerning its objectives and activities, not of a classified nature . . . is made available to the public." The converse of this statement is equally clear: The Army has the responsibility of ensuring that matter of a classified nature is not disclosed. Review of manuscripts written by military personnel and intended for publication is patently the most feasible way of carrying out that responsibility. The thrust of the regulation is thus unmistakable. Every commander is responsible for the creation and maintenance of a review procedure that will discharge his responsibility for the protection of matter of a classified nature. Establishment of such a duty of review by the Secretary of Army is entirely legal from the standpoint of general law, Dennis v. United States, supra; Schenck v. United States, supra; and it is clearly commanded by Consolidation Directive No. 1 and the Johnson memorandum.

Other of the accused's contentions of uncertainty, relate to the meaning of the words "clearance" and "submitted" in the sentence, "In no instance should the material be submitted to a publisher prior to clearance." Paragraph 15c. This sentence is also the core of the accused's argument that the regulation imposes no mandatory duty on Army personnel to submit their writings for review.

The regulation as a whole clearly creates an obligation on the part of all military personnel to submit their writings and public statements for security review. The duty appears as a necessary corollary to the duty of an Army commander to review such matter to insure against disclosure of classified material. Individual responsibility respecting disclosure is first mentioned in paragraph 3. It is reemphasized in paragraph 15b which expressly provides that personnel on active duty, which was the status of the accused, "will submit" their writings and public speeches to the appropriate security review authority.

Finding the existence of a legal obligation on the part of active duty personnel to submit their manuscripts for review is half of the answer. The remaining part is whether the duty extends to submission of the writing for clearance before it is turned over to a publisher. On that branch of the issue, the appellant emphasizes the change in wording between the two sentences in paragraph 15c, and relies upon the familiar principles of construction which normally require a mandatory construction for "will" and a permissive interpretation of "should."

We fully recognize the general principles of statutory construction urged upon us by the accused, but we do not reach the same conclusions. Rules of construction are mere aids ▮ in the ascertainment of the meaning of words, when the meaning is not readily apparent from a cursory reading of the whole text. In United States v. Merritt, 1 USCMA 56, 1 CMR 56, we held that the word "shall," although generally used in a mandatory sense, may be in-

terpreted as permissive. However, no part of a regulation should ▮▮▮▮▮ be construed so as to render a related portion inoperative or ineffectual. See: United States v. Lucas, 1 USCMA 19, 1 CMR 19. Moreover, when alternative interpretations are possible, the one selected should be that which gives effect to the purpose of the writings. United States v. Padilla, 1 USCMA 603, 5 CMR 31. Thus, even if we agree with accused's contention that "should" is normally construed as permissive, the use intended in the regulation is plainly mandatory.

The whole pattern of review set up in the regulation would be meaningless and ineffectual if classified ▮▮▮▮▮ material could be submitted to a publisher before clearance by a security review authority. No fertile imagination is required to conclude that any number of persons can learn of classified matter contained in any writing turned over to a publisher. Irrevocable and irreparable harm can come from disclosure of such material to a single unauthorized person. So, we experience no difficulty in concluding that the regulation creates a mandatory obligation. We hold that the regulation imposes a two-fold duty upon persons on active duty: (1) to submit a manuscript for review to appropriate security review authority, and (2) to obtain a clearance from that authority to the effect that the writing does not contain classified matter, before the material is turned over to a publisher. The kind of manuscript subject to the requirement is stated generally in paragraph 3 and specifically in paragraph 13a. Paragraph 3 provides as follows:

"3. General.—a. The United States Army is responsible for ensuring that information concerning its objectives and activities, not of a classified nature within the meaning of AR 380-5, is made available to the public."

Paragraph 13a reads as follows:

"13. General.—a. Within the bounds of security and Department of the Army policy, the writing of articles, books, and related material intended for publication, and the engaging in public and private discussions on appropriate occasions by military personnel, on topics of military and professional interest, or general interest concerning the Army, or in support of the military policy of the United States, or in the interest of the national defense, is authorized and desirable."

An alleged violation of these duties is set out in Charge II, the Additional Charge, and Additional ▮▮▮▮▮ Charge I. The findings of guilty on the first two of these charges were set aside by the board of review, but those on Additional Charge I were affirmed. That charge alleges, in substance, that the accused violated paragraph 15, AR-360-5, by knowingly submitting two articles to the New York Journal-American, without obtaining prior Army clearance. Photostatic copies of the articles were admitted into evidence. We have read them, and we cannot say that they do not touch upon matters of "general interest concerning the Army." Among several items in the first of these articles is the following statement, "In Eighth Army, through necessity and the exercise of common sense, the color barrier has all but crumbled. Perhaps the U. S. Army pointed the way when awhile back if [sic] reasoned simply: Ten percent of our population is colored; in time of military emergency we must have the willing service of so large a segment of our people; we'll do what is obviously the right thing to do to retain that willing service." In the second, besides comments on unification as it applied to Eighth Army, there is a concise analysis of the Eighth Army from 1951 to the date of the article, December 1952.

It may well be that nothing in the articles violates any security directive, but determination of that is properly reserved for the appropriate review authority. Under the command of paragraph 15c, the writings had to be submitted to such authority for clearance before they could be submitted to a publisher. The court-martial and the board of review have found

the accused guilty of violating this provision by submitting the December 1952 articles to the New York Journal-American before the writer obtained Army clearance.

The question of the sufficiency of the evidence is not before us; but even if it were, we would have to say that the record contains substantial evidence of guilt. Included in that evidence is testimony by the accused in a pretrial investigation by The Inspector General's Section, Second Army, in which he admitted his authorship of the articles and the mailing of them to the security review branch and to Mr. Richards. He also said that he did not deny "the technical aspects" of the "accusation" that he violated paragraph 15c by submitting the articles to the New York Journal-American without obtaining clearance. The violation may be only "technical," particularly since the writings seem not to contain any classified matter, but nonetheless the offense was committed. See: United States v. Grow, 3 USCMA 77, 11 CMR 77.

We turn now to the accused's attack on General Swing's order. That attack is two-pronged. First, he claims that the order deprived him of the privilege against self-incrimination; and his second contention is that the order violates the Johnson memorandum and AR-360-5. The first claim need not detain us long. The letter order which was delivered to the accused provided for acknowledgment of receipt by endorsement, and that the accused "state therein the action taken" to comply. This part of the letter does not appear in the specification alleging the violation of General Swing's order. Consequently, we need not determine whether such a direction would contravene Article 31, 50 USC § 602. See: United States v. Rosato, supra; United States v. Eggers, 3 USCMA 191, 11 CMR 191. Suffice it to note that this part of the original order was plainly subordinate and separable from that part which was made the subject of the charge.

As it appears in the charge, General Swing's order imposes a ▇▇▇▇▇ two-fold duty upon the accused: (1) to withdraw his manuscript from the publishers, and (2) to comply with paragraph 15, AR-360-5, until he obtained clearance from the Office of the Chief of Information. On its face, the order is not "palpably illegal," since it clearly relates to a military duty. Manual for Courts-Martial, supra, paragraph 169b, page 321; United States v. Trani, 1 USCMA 293, 3 CMR 27. Military personnel may properly be controlled in their disposition of personal property, when such disposition is not protected by any constitutional provision or Congressional enactment and is contrary to the requirements of the service. See: United States v. Martin, 1 USCMA 674, 5 CMR 102. Thus, if the order is illegal, illegality must appear from the evidence.

To place the evidence in its proper setting, we pause briefly to note the strange absence of particularity in the order. Normally, an order of this kind would describe the writing to be withdrawn with such detail as to exclude any question as to the manuscript intended. Here, the only specificity is "a manuscript" and "your manuscript." Patently, the draftsman had in mind a specific writing, and he had no doubt that the accused would immediately know the manuscript intended. This peculiarity takes on significance when we consider the circumstances from which the order resulted.

General Swing testified that he issued the order on the basis of the letter from General Dorn informing him of the unsuccessful efforts to eliminate the "policy" and "propriety" objections to the text of the disputed chapters, "The Generals" and "The Press." A copy of the accused's letter to Simon and Schuster authorizing them to proceed with publication was enclosed with General Dorn's letter. Plainly then, General Swing's order referred to these chapters, and it was intended that they be withdrawn for the purpose of submitting them to a review for "policy" and "propriety." It is equally clear that it was so understood by all the parties. However, under paragraph 15d, a commander may not impose restrictions other than to prevent "public disclosure of classified or erroneous information." Inasmuch as the order was intended to impose other restric-

**529**

tions, it was illegal. But, even if we regard the order as intended to ensure a security review alone, the final result attained by the board of review would not be different.

General Dorn wrote to Simon and Schuster on May 1, 1952, and advised them that security was "scarcely involved." Additionally, his testimony indicates clearly that the Army's objections to the critical chapters were based solely on policy and propriety. The board of review concluded from this, and other evidence, that the accused had, in fact, received security clearance from the Office of the Chief of Information. We cannot say that this finding is not supported by substantial evidence. Consequently, the record shows a situation in which the accused had obtained the required clearance prior to the order. It might be argued that since the accused did not actually withdraw the manuscript from the publishers, he violated at least that part of General Swing's order. However, withdrawal under then existing circumstances would have had as its purpose an act which had already been accomplished. Unquestionably such a useless purpose was not intended by General Swing. In the light of the background of the order, the first part is evidently dependent upon the second. Satisfaction of the latter would constitute a satisfaction of the former. Accordingly, we do not regard the action of the board of review in setting aside the finding of guilty of Charge I as being incorrect in law and unsupported by the record.

The Government would enlarge the scope of General Swing's order, and construe it as an effort to prevent the accused from violating the Uniform Code of Military Justice. Stress is laid, for example, on the alleged use of disrespectful language directed against General Douglas MacArthur which would be a violation of Article 89, 50 USC § 683. However, such extension of the order is precluded by its language and the circumstances from which it resulted. Therefore, we are not required to consider what might be the result if General Swing's order

had, in fact, been directed to the purpose now asserted by the Government.

We now reach the final question certified by The Judge Advocate General. The issue, in the language of the question, is, "Did redelivery by the accused of a portion of his manuscript to Simon and Schuster about June 1952, (Charge II), constitute a 'submission' within the meaning of Paragraph 15, AR-360-5?" The board of review held that the findings of guilty of Charge II were incorrect in law and fact. In its opinion, it acknowledged, but chose to ignore, the difference in the Government's position at the trial and its appellate stand before the board of review.

At the trial, the prosecution argued that the alleged submission occurred on or about June 15, 1952. On ■■■■■■■■ appeal before the board of review, the Government was equally firm in contending that the delivery of the manuscript was in December 1951. In this Court, the Government has taken a third position. It now contends that the delivery of the manuscript in December 1951 constituted a submission, but that later the accused withdrew the manuscript and again submitted it on May 8, 1952. The difficulty with the Government's present position is that the board of review determined, as a fact, that the clearance required by the regulation had been obtained prior to any activity of the accused in May and June 1952. The board of review had the right and the duty to reweigh the evidence. The record contains substantial evidence to support its finding, and we cannot set aside that finding because we might take a different view. The evidence does not demarcate, as a matter of law, the acts of the accused in December and those in May and June; it reasonably supports a factual determination that all of the accused's activities were essentially part of a single transaction. Consequently, we cannot hold, as a matter of law, that the redelivery of the critical chapters to Simon and Schuster constituted a separate submission in or about June 1952.

In view of what is said in the other

opinions in this case, I think I should make it clear that, in my ▮▮▮▮▮ opinion, every individual in the military service is entitled to the same constitutional rights, privileges, and guarantees as every other American citizen, except where specifically denied or limited by the Constitution itself. See my dissenting opinion in United States v. Sutton, 3 USCMA 220, 11 CMR 220. But there are differences between the civilian and the military communities. In the military sphere, punishment for violation of law is not always an adequate protection against an abuse of a Constitutional privilege; then *prevention* rather than punishment becomes imperative. The line of reasoning delineated in cases like Near v. Minnesota ex rel Olson, 283 US 697, cited approvingly by Judge Brosman in his dissent, is workable, and perhaps even highly desirable, in the civilian community. However, it hardly serves a useful purpose, in the instant case, where one false move could be extremely dangerous, and one false word could be disastrous, or even fatal. Prevention rather than punishment becomes necessary to protect and preserve the lifeline of the republic in the theatre of military operations. It is that problem which confronts us here. And it is that difference which makes it reasonable to impose security measures on publication and disclosure to unauthorized persons, rather than to rely upon punishment for a consummated abuse of a Constitutional privilege.

The board of review in affirming its finding of guilty determined that the sentence was appropriate ▮▮▮▮▮ for the offense. However, a sentence to dismissal and total forfeitures for what is essentially only a "technical" violation of a regulation is exceedingly severe. Cf. United States v. Grow, supra. I need not decide how far the board of review can legally mitigate dismissal to some other punishment. See Manual for Courts-Martial, United States, 1951, paragraph 126*i*, page 212; Mullan v. United States, 212 US 516, 53 L ed 632, 29 S Ct 313. Suffice it that the board of review seems either not to

have been aware of the full extent of its powers or, as Judge Latimer suggests, it believed that it could not approve any lesser sentence. We all agree that further action should be taken with regard to the sentence. We further agree that, in view of the dismissal of all the major charges, the interests of justice will best be served by permitting a primary rather than a "secondary and derivative" redetermination of the sentence. See United States v. Brasher, 2 USCMA 50, 6 CMR 50.

For the foregoing reasons, the decision of the board of review is reversed and a rehearing is ordered on Additional Charge I.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

Because this case involves principles of great moment to the military services and because there is a three-pronged approach to the final result, I will make some general observations concerning the views expressed by my associates and then develop my reasons for reversing the decision of the board of review.

I believe it ill-advised and unwise to apply the civilian concepts of freedom of speech and press to the ▮▮▮▮▮ military service unless they are compressed within limits so narrow they become almost unrecognizable. Undoubtedly, we should not deny to servicemen any right that can be given reasonably. But in measuring reasonableness, we should bear in mind that military units have one major purpose justifying their existence: to prepare themselves for war and to wage it successfully. That purpose must never be overlooked in weighing the conflicting interest between the right of the serviceman to express his views on any subject at any time and the right of the Government to prepare for and pursue a war to a successful conclusion. Embraced in success is sacrifice of life and personal liberties; secrecy of plans and movement of personnel; security; discipline and morale; and the faith of the public in the officers and men and the cause they rep-

resent. In connection with this litigation, it is to be remembered that while we can discuss the principles involved in a time of temporary peace, that is the period during which we must prepare for war or other eventualities. A principle which interferes with preparing for war may interfere with its successful prosecution; and a privilege given unwittingly in peace may be a death knell in war.

So far as I have been able to discover, the United States Supreme Court has never passed on the precise question which now confronts us. It has, however, pointed out one rule which seems to be the golden thread running through all of its pronouncements. That rule, paraphrased from a number of opinions, is that while freedom to think is absolute of its own nature, the right to express thoughts, orally or in writing, at any time or place, is not. I need not take sides in the great debate as to whether the right of free speech occupies a preferred position which must be jealously safeguarded by the judiciary. Some opinions say it does, others are to the contrary. Either view can be taken without detracting from the principle that in the armed services it must be subject to those restrictions which are necessary to successful operations. Time after time the Supreme Court of the United States has stated that the right to speak freely must be considered in the light of attending facts and circumstances. That principle to me seems implicit in the "clear and present danger" concept. If such is the case, then the rights of the man in the service must be proportioned by a more refined measuring rod than are those belonging to the man in the street. What may be questionable behavior in civilian life, and yet not present any danger to our form of Government, may be fatal if carried on in the military community. The substantial interest of society with which we deal must be weighed on scales adjusted to the necessities of the military service, and I believe they always have been. Unless the concepts under which this nation has waged war successfully are erroneous, then the exigencies of the military service demand circum-

scription of the right of free speech and suppression of publications which contain information detrimental to the morale, discipline, and security of the services. No officer or man in the armed forces has a right, be it constitutional, statutory, or otherwise, to publish any information which will imperil his unit or its cause. Neither does he have the right to make public confidential information he receives by virtue of his military assignment which might impair seriously the efficiency of the military machine. It should require little imagination to visualize the havoc that would result if military authorities were denied the right to censor written communications or dispatches for national security purposes. One versed in the difficulties of maintaining secrecy in the armed forces can well imagine the holocaust if security had to be abandoned. Members of the press who have been foremost in pleading the cause of freedom to speak and write would hardly insist that the principles weighing in favor of freedom of expression outweigh those favoring national security. Their willingness to accept censorship on matters involving national security is proof of that statement. While the factors which must be considered in permitting military disclosures may appear to vary in peacetime and wartime, they are substantially the same. If all persons who are presently working in sensitive military or civilian plants could, without restriction, publish their knowledge, their thoughts, and the information they obtain by virtue of their employment, the probabilities that this country would survive as a nation would be considerably lessened, if not rendered nonexistent.

I have purposely approached the problem largely from the standpoint of security as that furnishes the firmest support in favor of control. But policy and propriety interests of the military likewise support regulation of public utterances. Briefly I will dwell on the reasons why I believe that to be necessary. At the heart of every successful military force are morale, discipline, and public support of the cause. An army which lacks those cannot hope to succeed. What I have previously stated

in regard to security, applies in part to policy and propriety. A wise policy, a fair sense of propriety, underlie morale and discipline. No man willingly lays down his life for a national cause which he is led to believe is unsound or unjust. Yet implicit in military life is the concept that he who so serves must be prepared to do so. If morale and discipline are destroyed, our forces cannot be trained adequately, and the nation must necessarily fail in battle. A few dissident writers, occupying positions of importance in the military, could undermine the leadership of the armed forces; and if every member of the service was, during a time of conflict, or preparation therefor, permitted to ridicule, deride, deprecate, and destroy the character of those chosen to lead the armed forces, and the cause for which this country was fighting, then the war effort would most assuredly fail.

By way of illustration, in this particular instance, General MacArthur had been in command of the United Nations Forces in Korea. For the purpose of testing the principle, I can assume he was still in command at the time the manuscript was placed in circulation. One of the chapters of the book was devoted to his utter disregard of the fundamentals of military secrecy. It is not difficult to comprehend that an officer assigned to the position occupied by this accused could, by virtue of his assignment, and through false and misleading statements, destroy the faith and confidence of the people of the free world not only in the leadership of General MacArthur, but also in all other American officers. It matters little whether the published comments were true or false because the effect on the public would be the same and the cause would be weakened. It seems to me to be doubtful reasoning to suggest that, if false, the General might institute court-martial proceedings to punish the offender. His major task is to fight a war, not a lawsuit. Criminal sanctions may be adequate in civilian circles, but preventative measures must be taken in the military. It is too late to apply criminal sanctions after the battle is lost. A concept that

a commander is not entitled to have the faith and confidence of his men and the support of the American people uninfluenced by false and unjustified accusations is fundamentally false. Hypothetical cases of every type could be developed to prove that, unless Army policy and standards of propriety were respected by members of a command, chaotic conditions would result. It might well be that, under certain peacetime conditions, all officers could be held up to ridicule and contempt by members of their command; but if they were, I have good reasons to assert that such unbridled accusations would have a measurable impact on the discipline and morale of the unit in particular and the service as a whole. Stated hypothetically, I can well imagine what might happen in Korea if, at the present time, an American officer there on duty were to publish an article in a national publication that the commanding general of the American troops in that area was collaborating with the communists. It is to be remembered that military personnel are not without recourse if they have cause for complaint or suspicion as other channels have been provided through which any member of the armed forces may, in confidence, air allegations of any nature.

Congress must have realized the potential harm in permitting unbridled expressions of opinions by service personnel as Article 88 of the Uniform Code of Military Justice, 50 USC § 682, proscribes the use of contemptuous words against certain enumerated public officials. If an attack on those officials can be made the basis for criminal prosecution, and I assume it can, then a scurrilous publication about a commander should not be considered less serious. Certainly, the latter clashes head-on with other Articles of the Code and the customs of the service, and has a greater tendency to bring discredit on the military service and to interfere more with its assigned mission. Furthermore, Congress has prohibited the publication of articles which interfere with the proper waging of war, and the Supreme Court has upheld the statutes. In the oft-cited case

of Schenck v. United States, 249 US 47, 63 L ed 470, 39 S Ct 247, the defendants were convicted of publishing articles which had a tendency to obstruct recruiting. Mr. Justice Holmes, speaking for the Court, stated:

"But it is said, suppose that that was the tendency of this circular, it is protected by the First Amendment to the Constitution. Two of the strongest expressions are said to be quoted respectively from well-known public men. It well may be that the prohibition of laws abridging the freedom of speech is not confined to previous restraints, although to prevent them may have been the main purpose, as intimated in Patterson v. Colorado, 205 US 454, 462, 27 S Ct 556, 51 L ed 879, 10 Ann Cas 689. We admit that in many places and in ordinary times the defendants, in saying all that was said in the circular, would have been within their constitutional rights. But the character of every act depends upon the circumstances in which it is done. Aikens v. Wisconsin, 195 US 194, 205, 206, 25 S Ct 3, 49 L ed 154. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre, and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. Gompers v. Buck's Stove & Range Co. 221 US 418, 439, 31 S Ct 492, 55 L ed 797, 34 LRA NS 874. The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight, and that no Court could regard them as protected by any constitutional right."

If it is necessary for survival that this country maintain a sizeable military establishment, and under present conditions that must be conceded, then

I have a great deal of difficulty in following an argument that those who serve should be entitled to express their views, even though by so doing they may destroy the spirit and morale of others which are vital to military preparedness and success. I have no disposition to deny the validity of the argument that the benefits derived from free expression by civilians may be worth the risk of endangering the future of the Republic. That concept, however, fits civilian society where conditions permit full debate and full development of both sides of the controversy. Full and complete information is essential to the proper solution of problems which face a democracy during periods of tranquility. Ideas for combatting false ideals and misguided ideologies can germinate in that climate, and informed discussion is desirable. That method of meeting false charges is characteristic of a democratic form of Government, but it presupposes time in which the public can be fully informed on the merits and demerits of each contention and a delay in the solution is not of grave importance. However, a military organization cannot be governed by those processes. In training a civilian army, time is of the essence. A war cannot be won in the halls of debate, and conditions do not permit meeting lies with the truth. A syndic preaching syndicalism to servicemen can hardly be neutralized by a patriot teaching patriotism. But even assuming he could, that process places a burden on the service which, during times of stress, it should not be required to carry. In a time of peace, those who voluntarily or involuntarily work to protect our nation should not be required to toil in contention and strife engendered from within. It is enough that they might be required to labor while being critically assailed from without. A citizen, within certain limits, may circularize his cause, be it noble or ignoble, as there is little danger to a constitutional form of Government in an ordinary crusade. But one false rumor, timed properly, may destroy an army. Assuming arguendo that the privilege of free speech is a preferred right, we

534

should not prefer it to such an extent that we lose all other benefits of our form of government. A demoralized and undisciplined military service could cost us all those we possess, and hostility to prior restraints on communications should not be permitted to endanger our nation.

In summation of this portion of my opinion, I conclude that the armed services have the power to limit the right of free speech of their personnel, but the power must be considered in two ways: First, for the power to regulate the flow of information and, second, for the authority to suppress or prohibit its publication. They, in one sense, blend as there is no absolute free speech or free press if permission must be obtained from an official in the service before publication. His arbitrary refusal to clear may be tantamount to prohibition and officials can be tyrants, but that alone does not justify uncontrolled disclosure. While the principles which govern the right to regulate communications, and the right to prohibit them may differ, I believe the armed services could require submission of any and all writings. That is not to say they could prohibit the publication of those which have no reasonable relationship to security, army policy, or military propriety; but they could require an inspection to make certain those matters were not violated. The question in the instant case is whether the Army did so with sufficient certainty and legality to support the conviction.

Now to the core of this case. I must concede that Judge Brosman has much the better of the argument on the construction to be given the provisions of AR–360–5, dated October 20, 1950, and Secretary of Defense Johnson's letter. I reach the same result as he, but I arrive at my conclusion in a slightly different manner. It is a cardinal principle of construction that words in a regulation are to be interpreted in their ordinary acceptation, significance, and the meaning commonly attributed to them. I see no necessity for departing from that principle in this case. For many years the Army has considered policy and propriety to be isolated from

security. A violation of the latter may offend against the former but the converse is not equally true. Many matters of policy and propriety do not involve security except in a remote and indirect manner. I recognize another general principle of construction that writings dealing with the same subject matters should, if possible, be construed so as to be harmonious. However, I find no way in which the wording of this regulation can be tortured into being consistent with the letter. Of course that construction may be arrived at by discarding their recognized meaning, by ignoring the administrative construction given the words over the years, and by refusing to accept the meaning attributed to them by the officers of the reviewing section. As for the construction over the years, I need not go back into early military literature and historically develop the Army interpretation as I believe it sufficient to show that AR–600–700, dated May 24, 1945, recognized that the terms were not used synonymously. That regulation, which is the immediate predecessor to AR–360–5, marked out two separate areas for clearance. Security clearance applied to anyone who released information pertinent to the military establishment. Propriety clearance was limited to military personnel. The present regulation makes the same distinction as it requires security clearance in some instances and policy and propriety in others. Finally, the Johnson letter recognizes the disassociation by retaining security review and at the same time eliminating clearance for other reasons. When considered in the light of those matters, I find the two documents irreconcilable.

That brings me to the effect of the Johnson letter. I must accept the concepts announced by the board of review and by the Chief Judge that the Secretary of Defense had authority at the time that letter was written to limit the scope of Army Regulations then in effect. The Army was a subordinate department to the Department of Defense, and, in the event of inconsistency, the latter's regulations would be con-

trolling. The Secretary of Defense narrowed the then existing Army Regulations, and limited those enacted subsequently, by requiring that review be restricted to matters touching on security. In the state of the nation, at that time, there may have been some good reason to let down the control bars, but that is a question which I do not resolve as it deals with policy matters which belong rightly to another department of the Government. I can say, however, that so long as that letter is in effect, the services are not authorized to go beyond its fair confines and prosecute personnel who have met its requirements. If it has opened the floodgates too far, some enactment from the same or higher headquarters would be necessary to close them. Government counsel contend ▮▮▮▮ that the memorandum issued by President Truman on December 5, 1950, as supplemented by the Department of Defense Directive No. 5230.1, dated July 27, 1951, had that effect. The argument, however, cannot be supported by either the memorandum or the directive. In essence, the prohibitions contained in both refer to public speeches, press releases, or public statements dealing with the foreign or military policy of the Government. The memorandum was to military and non-military officials and was intended to cover a field connected only remotely, if at all, with our problem. The purpose, as stated in that memorandum, was not to prohibit the flow of information to the people of the United States. I must, therefore, conclude that its purpose was to prevent the discussion of major military policies by officials which would have some direct effect upon our relationship with other members of the United Nations, and the clearance required by the Department of Defense Directive was limited to communications which fell within those fields. If we were concerned with a publication which trespassed in the intended areas, a different problem would be presented; but, at most, the memorandum would only rescind the Johnson letter where there was a conflict in their requirements. Both documents required security review, but neither overruled the

Army Regulation that articles dealing with military subjects must be submitted for clearance. Assuming arguendo that there might be some slight inconsistency, it would not be relevant to the case at hand. I can arrive at that conclusion because under the Presidential memorandum, the Johnson letter, and Army Regulations, the accused was required to forward his manuscripts for clearance which, in part, he did, and his present conviction is supported only by the release which he failed to submit.

That brings me to AR–360–5, published on October 20, 1950. There are reasons which could be advanced as to why those regulations, which were published after the Johnson letter, were intended to be broader in scope than the provisions of the letter. It would be the work of supererogation to mention them all. I will, therefore, content myself with suggesting one. At that time, the authority of the Secretary of Defense to legislate on such matters might have been open to question. I have only set up a possibility, but, regardless of the reason, the regulation was drawn in conflict with the letter and it could not extend beyond the limits set out by the Secretary of Defense. To the extent that it exceeded the scope of his memorandum, it is unenforceable. I, however, find no restriction by ▮▮▮▮ the Secretary on the power to require submission. All I discover is that he denies public information officers the right to require deletion of matters touching on policy or propriety. To that extent the documents are inconsistent and the officers in the review section exceeded their authority by demanding policy and propriety deletions. The board of review decision, however, reversed the findings which were supported by that improper ruling and thus cured the error.

I do not encounter the same difficulty with AR–360–5 as do some of the other officials who have participated in this litigation. Much has been said about the necessity of submitting a manuscript covering "the love life of a rattlesnake." I find no such requirement. The Army Regulation is entitled "Public Information" and its general provi-

sions well limit its purpose and scope. Paragraph 2 defines public information as follows:

"Public information is defined as any undertaking conducive to public understanding, confidence, and support through factual interpretation of the Army to the American people. It includes continuous dissemination of information and professional opinion to the public, participation in community life, and a line of conduct by uniformed personnel which will contribute to public understanding and consequent appreciation of the military service."

As I will later point out, all provisions of the regulation deal with public information as it is defined, and. I fail to appreciate how a dissertation "on the love life of a rattlesnake" would contribute to a public understanding and consequent appreciation of the military service. I gather from the arrangement of parts, the contents, the specific subjects disclosed, and the objective of AR–360–5 that it deals solely with military information. It places the responsibility for properly informing the public about the military service on certain commanders. Those officers include the Chief of Information Section; Chief of Army Field Forces; Continental Army Commanders; Commanding General, Military District of Washington; Commanders of Class 2 installations and activities; and overseas commanders. In all instances their authority is narrowed to information which deals with military subjects. Public information officers are special staff officers who have certain assignments and duties. They are assigned to the staff of all commanders down to and including the regiment or comparable unit. Their authority could not surpass that of their immediate commander who is charged with reviewing for security, under established policies, all communications concerning the local military command and situation which is to be disseminated to the local public through local information media.

Section 4, which includes paragraph 15, is particularly relevant to our discussion. It is entitled "Release of Military Information." That section states that the writing of articles, books, and related materials intended for publication on topics of military or professional interest or general interest concerning the Army, or in the interest of national defense, is desirable. Again, it is only dealing with military information, and that is the reason that paragraph 15 requires the submission for review. The material parts of that paragraph are as follows:

"b. Public information officers normally perform the duties of security review. This function is limited to the deletion of classified matter and review for accuracy, propriety, and conformance to policy. Specific violations of security directives, policies, or regulations will be brought to the attention of the person submitting material for review.

"c. Personnel of the Army Establishment are personally responsible for their writings and public statements. Personnel on active duty will submit their writings and public statements to the appropriate security review authority. Retired personnel and civilian personnel employed by the Army Establishment will submit their writings and public statements to the appropriate security review authority when the material concerns military subjects. In no instance should the material be submitted to a publisher prior to clearance. Civilian component personnel who have written material intended for public release which concerns military subjects should submit the material to appropriate security review authority when there is any doubt concerning its security or propriety."

Unless we desire to charge officials of the Army with a desire to control thought on every conceivable subject and take unto themselves a burden clearly outside the scope of their own publication, it is absurd to contend that matters of a nonmilitary nature, which have nothing to do with the armed services, need be submitted for accuracy, propriety, and conformance to policy. One misinterpretation by an officer of a section does not fix the law, and if it

be contended that the Office of the Chief of Information interpreted the regulation erroneously and the accused was convicted on the misinterpretation, we would be required to reverse. However, the short answer to this is the accused wrote about military matters and as to them the requirement to submit was clear and positive.

While much has been said about the vagueness of AR–360–5, I believe it is irrelevant for our purposes. While the word "propriety" and the phrase "conformance to policy" may be indefinite, uncertain, and all-inclusive, it is not necessary that this particular regulation be complete in itself. Other regulations and directives can be issued which limit the interpretation of those terms and which give content and body to their meaning. I would have no difficulty if an Army directive stated it was contrary to the policy of the Army to have military personnel advocate publicly that enlisted men should desert to find that one charged with violating Army Regulation 360–5 by publishing articles exhorting men to do so would be furnished with sufficient standards to permit him to prepare his defense. However, any discussion of that matter at this time is academic. If and when regulations requiring review and deletion on those matters are in effect, the issue may become relevant.

At the time of the Johnson directive, which was issued June 7, 1949, AR–600–700, dated August 16, 1946, was in force and effect. That regulation was not complete in setting out the mechanics for clearance; but when interpreted in the light of military tables of organization and customs of that service, there were certain matters made crystal clear. These were as follows: That there was a public relations officer appointed on the staff of each regiment or higher unit; that he was to review, under established policies, all material to be disseminated to the public; that military persons were limited in making public pronouncements; and that within the limits of security and propriety, officers and men were encouraged to express their views. It appears implicit in

the regulation that, if officers and men were to be circumscribed by propriety and security, someone in the military must clear their public utterances for those purposes, and obviously that would be the appropriate public relations officer. No difficulty should be encountered in identifying that officer. Illustrated militarily, if the author was a member of a regiment, the public relations officer of that particular regiment would consider the manuscript for clearance. If the author was assigned to a divisional organization, then the officer on division staff would be the appropriate authority. If the writing covered subjects which were outside their spheres of responsibility, or clearance was doubtful, then there were channels of communication by which the document could reach top level authorities.

The present regulation varies the procedure in obtaining clearance little, if any, from its predecessor. Public information officers are appointed on the same staffs. Appropriate security review officers are provided for and they are readily identifiable. Channels of communication have not been changed. One seeking to obtain clearance can always comply with the present directive by submitting his article to the commander who is first in the chain of command. If processing there is deemed inadvisable, the writing or the proposed speech would be forwarded through appropriate military commanders. Other correspondence has for years been processed in that manner without too much difficulty, and I see no reason why a manuscript poses obstacles which are insurmountable. This should answer the contention that the present regulation is so vague that accused was not apprised of the person to whom he should submit his various articles. But there is more to be offered to answer the contention. The Chief Judge, in his opinion, meets persuasively the assertion by analyzing the pertinent provision of the regulation. Furthermore, the accused had occupied a sensitive position on the staff of Headquarters, Eighth Army, in Korea. He was familiar with the principles governing censorship and with requirements for

538

clearing writings. An officer with little or no experience could have ascertained the appropriate security review officer. In short, the accused would have encountered no difficulty in getting his manuscript to those authorities who had the authority to clear the subject matter about which he wrote had he been so inclined. His knowledge of the channels of communication was not so limited as to cause him any serious difficulty about clearance. Therefore, pretermitting the question not here in issue, namely, whether the terms "policy," and standards of "propriety" are so vague and indefinite as not to warn fairly the accused of the nature of the offense he must defend against, I find only the Johnson letter which renders AR–360–5 unenforceable. As previously stated, that affects only the scope of review.

Applying my views to the individual charges and specifications, I reach the same result as the Chief Judge and concur with most of what he states. In the interest of clarifying my concurrence, I will discuss my views briefly. The first specification of Charge I alleges a violation of Lieutenant General Swing's order to withdraw the manuscript. Obviously, if the Office of Public Information, Department of the Army, did not possess the power to refuse accused the right to publish his writings until he had deleted certain passages, claimed to be contrary to its views on policy and propriety, it did not have the authority to order withdrawal. It could not accomplish indirectly what it could not do directly. General Swing, commanding a subordinate army organization, could not within his authority direct withdrawal. His authority would be no greater than the authority of the Department of the Army, and both were proceeding on the theory they possessed powers which had been denied them by the Department of Defense. The accused has a right to disobey an order at his peril and while it is presumed to be legal, in this instance the presumption is dispelled by the evidence. I, therefore, conclude the first specification of Charge I was reversed properly.

The specification laid under Charge II alleged a violation of AR–360–5, dated October 20, 1950, by sub- mitting a manuscript to the publisher without obtaining prior Army clearance. The specification alleges the date of the offense as June 15, 1952. I glean from the record that the theory of the Government was predicated on accused's submission of the manuscript sometime after he and the Army authorities became involved in a controversy over the right to publish. Otherwise, I cannot account for the date chosen by the pleader, to set out the offense, and the one relied on by the law officer in his instructions. The preliminary negotiations appear to have commenced on or about December 1, 1951, and it is entirely possible that submission was completed on or about that time; but the facts do not spell out the precise time with certainty. The accused is entitled to be informed of the date of the offense with some degree of certainty and the Government, having elected to allege the date of the offense as June 15, 1952, cannot now rely on events happening on a date that is not encompassed fairly within that time. Had it sought to amend the specification after the evidence was completed, the accused, if he desired, could have made certain motions to protect his rights but they are not now available. In testing the evidence for insufficiency, I must look to the transaction which I believe the Government used to support the charge at the trial level. The record establishes that on or about March 4, 1952, the nonfictional chapters of the manuscript were submitted to the Office of Public Information, Department of the Army. That office took the position that, although no security violation was involved, the material could not be approved for publication. On May 10, 1952, the accused discussed with officers of the Department the modifications which might be made to obtain clearance. A mutual agreement was not arrived at and on or about June 20, 1952, he wrote the publishers authorizing them to proceed. The foregoing facts establish that the accused had submitted his manuscript for review and

it was cleared for security purposes prior to the time the offense alleged in the specification was committed. No other clearance was required. Accordingly, the facts do not sustain the offense alleged and I concur with the holdings of the board of review and the Chief Judge that the finding must be reversed.

The next charge alleged, in substance, that the accused violated AR–360–5, dated October 20, 1950, by ■■■■■■ submitting certain material to the publishers of the magazine entitled "Argosy" without obtaining prior Army clearance. The evidence discloses that the material submitted to support this charge consisted of photostatic copies of pages taken from the manuscript which formed the base for the charge previously discussed. The date of the submission of the photostats was on or about June 20, 1952. The finding on this charge must be reversed for the reasons which required a reversal on the other charge. The manuscript from which the copies were taken had been cleared for security purposes, and if there was no offense committed in submitting the entire book to one publisher, there could be no offense for submitting certain parts of the book to another publisher at a later date. Accordingly, the finding on this charge must fall.

I can now pass by the findings on Additional Charge II as this appears to have been decided factually ■■■■■■ by the board of review. That brings me to the last offense and the finding which the board of review affirmed. In this specification the accused is charged with submitting certain articles to the New York Journal-American without obtaining prior Army clearance. The Chief Judge sets forth his reasons for affirming the findings and I concur therein. As stated by him, the accused admitted the violation and sought to justify his acts because: (1) they were necessary to meet the publication deadline; (2) his actions were in accord with established custom in such cases; and (3) he questioned the right of the Army to control what a writer might do with his manuscript prior to actual publication. These alleged defenses cannot be sustained for the reason that the first is not a defense to the charge, even if established. There is no evidence to sustain the second; and the third is controlled by our holding that the Army can require clearance before submission. I have not overlooked the contention that there was no submission within the fair meaning of that term, but the Chief Judge has answered that contention. I subscribe to his views and I support him in his holding that the finding on this charge is sustained by the evidence.

One more issue is presented for resolution. Accused assails with determination the action of the board of review in affirming only one finding and then affirming the sentence imposed by the court-martial. This argument has considerable merit and must be resolved in his favor.

At the time the court-martial members deliberated upon the sentence they were charged with the duty of fixing an appropriate sentence for the commission of three offenses of major import and two others which by comparison were of secondary importance. The first offense involved the willful disobedience of the written order of the commanding general of one of the continental armies. The issue between Lieutenant General Swing and the accused had been drawn clearly by the specification and the head-on clash between the two was magnified by the evidence presented at trial. The General had sought to compel compliance with what he had cause to believe was a proper request from higher headquarters by reinforcing that directive with the authority of his office and his person. The dignity and significance of a personalized military order such as this is exceedingly great, and it would be overlooking the realities of the military service to minimize it. We have emphasized the seriousness of wilfully disobeying a command and Colonel Winthrop is an authority for the concept that "Obedience to orders is the vital principle of the military life —the fundamental rule, in peace and in war, for all inferiors through all grades from the General of the Army to the newest recruit." Winthrop's

540

Military Law and Precedents, 2d ed, 1920 Reprint, pages 571–572. Undoubtedly the officials of the Army realized that the most effective way to compel obedience to its policy and propriety declaration was to position the accused so that he must either comply with an order or suffer the severe penalty flowing from the wilful flouting of the authority of a senior commander. The challenge, if it may be so characterized, was accepted by the accused, deliberately, and with no attempt to retreat. The order was given and the accused, an officer of considerable experience, flatly refused to obey. It cannot be denied that a finding of guilt on that offense would have an all powerful influence on the sentence imposed.

The second offense went to the heart of the controversy which led to this trial. Briefly, the Army high command believed that it had the authority under its regulations to censor manuscripts for propriety and conformance to policy. Voorhees concluded to test that power. The evidence is clear that the Army never formally cleared the manuscript in question; that "policy" and "propriety" objections were the cause of withholding its imprimatur; that accused was well aware of the official view taken by the military officials; that he was given many opportunities to accede to the directions of the Office of the Chief of Information; and that the questioned portions of the manuscript were published unchanged. If it is accepted as a premise, as it apparently was by the members of the court-martial, that the Army officials are directed by regulations to exercise a propriety and policy censorship, then it follows that the accused was guilty of a substantial criminal offense. His failure to obtain policy and propriety clearance was deliberate; and he chose to make a top ranking officer in the Army the principal object of his criticism. No prosecution would have resulted had the accused made the changes requested by the Office of the Chief of Information. His failure to do so was the source of all the important alleged offenses. Surely then, the submission by the accused of this manuscript to his publisher, contrary to his specific instruction, weighed heavily on the court-martial members in assessing sentence.

What I have said with regard to the second offense applies with equal force to the third offense of which the accused was found guilty. The same subject matter was the object of dispute. While a different publisher was involved, this would only tend to aggravate the matter for the author's views were more widely circulated in a magazine of national distribution. This, then, was a third finding of guilty of a major offense which would have a measurable impact on the severity of the sentence.

By one specification, and the proof to support it, the accused was convicted of wrongfully communicating directly with the Office of Public Information, Department of Defense, rather than proceeding through channels. This conviction was disapproved by the board of review because of insufficiency of evidence. Therefore, the sentence, as approved by that agency, must be measured without consideration of this finding. Here, just as with the offense subsequently discussed, we have what was a technical violation minor in character. However, we must accept the premise that this violation operated to influence in some degree the sentence adjudged by the court-martial.

The one delict considered by the court-martial, and affirmed finally on appeal, concerned the submission of several articles by the accused to the New York Journal-American without obtaining prior Army clearance. This allegation is supported by the record of trial and has been affirmed on review; but of all the offenses charged, this is one of the two of least importance. It was made plain at the trial that these articles did not offend against the standards prescribed by the Office of the Chief of Information; that the articles were never published; and that neither the accused nor the newspaper contemplated publishing the articles prior to obtaining the necessary clearance. The file establishes that the accused notified the publisher not to publish the article until clearance had been obtained. Granted that we have one violation of a pertinent regulation in the overall issue

**541**

in this litigation, it is a minor violation at best; and we can say, in the light of the more serious breaches considered by the court-martial, that it was a factor of little importance in fixing an adequate sentence.

In summation of the offenses, and viewed through the spectacles of the court-martial members, this accused was found guilty of three major offenses, one of which amounted to an affront to the dignity of both the office and the person of his commanding general. The other two principal crimes were deliberate violations of Army regulations which are regarded by the military community as offenses of more than passing significance. Two other "makeweight" offenses were mixed in to the finding-base which was used to support the sentence. What was deemed to be an appropriate sentence was then adjudged. Before the board of review and before this Court, the base was demolished, the accused was vindicated as to the three major offenses and one of the minor offenses, and all that remains is a minuscule support. If the penalty fixed by the members of the court-martial was an appropriate reparation for the wrong believed done, then it is impossible for a reviewing court to determine, even within broad limits, what sentence would have been meted out by them for the single picayune valid conviction. Moreover, unless the board of review was misled as to its authority, it is difficult to understand how an accused can win on so many substantial findings and end up with the same harshness in sentence. It must be remembered that the presumptions in regard to sentences in the civilian courts do not apply in the military courts-martial. In United States v. Keith, 1 USCMA 442, 447–448, 4 CMR 34, we stated:

". . . While a civilian judge is presumed to be learned in the law, the members of a court-martial cannot realistically be assumed, required, or expected to be familiar with technical legal rules. Thus, while there may be basis in reason for holding that the court in the civilian area shall be deemed to comprehend the procedural complexities of the situation, and to award judgment and sentence on the valid count only, the same presumption cannot be indulged logically in the military system. Indeed, the presumption there would seem to point in an antithetically opposed direction."

In United States v. Brasher, 2 USCMA 50, 52, 6 CMR 50, we had occasion to make an observation which is singularly apt here:

"In a special and peculiar sense the sentence of the law for adjudged misconduct—military or civilian—is the product of a trial court. It alone, of all agencies of the law, is authorized to 'adjudge' the law's penalty. True it is that review agencies are empowered to take varying sorts of action with respect to this phase of the trial court's task, but their function in this particular is secondary and derivative. They merely 'approve' or 'disapprove,' 'affirm' or 'reverse.' The trial court, on the other hand, 'imposes'—it determines as an original, a basic, and a primary proposition."

The Government argues that the sentence of the court-martial, founded on all the specifications, can be sustained by the one affirmed because the board of review, after considering the modified findings, affirmed it as appropriate. In the usual situation, this Court would be powerless to interfere wth a sentence affirmed by the board of review but here that tribunal was faced with a predicament. Under the Code and our previous opinions, it has no power to commute a sentence of dismissal or death, where that sentence is legal. Article 71, Uniform Code of Military Justice, 50 USC § 658; United States v. Bigger, 2 USCMA 297, 304, 8 CMR 97. That power has been delegated by Congress to certain officials of the executive department. Thus, in so far as its own power to deal with this sentence is concerned, the board could only affirm the sentence adjudged or disapprove the sentence in its entirety. Having affirmed one finding, the board of review would not be apt to leave the accused

unsentenced nor should it so do. To all intents and purposes, the restriction thus made the sentence mandatory on the board of review which decreases to a vanishing point its obligation to affirm only such parts, or amount of sentence, as it finds correct in fact and law and determines on the entire record should be approved. Article 66, Uniform Code of Military Justice, 50 USC § 653.

One other avenue remained open to the board of review to correct any inequities in this litigation. ▮▮▮▮ A rehearing before the court-martial could have been ordered to permit a sentence to be adjudged in the light of the offense committed, if a finding of guilty on the one specification resulted. The board of review elected not to pursue that method and, for reasons which I will hereinafter set forth, I feel the board of review thereby abused its discretion. On previous occasions when redetermination of the appropriateness of the sentence became necessary, we have been content to remand the case to a board of review for reassessment. This we have done because remand to the trial forum is seldom necessary to achieve a fair and just determination of the sentence. But that is not to say that such a proceeding may not be adopted when the only choice left to a board of review is to affirm the sentence or free an accused. That we have previously sought to make clear. United States v. Keith, supra. See our action in United States v. Field, 3 USCMA 182, 186, 11 CMR 182. Here, the findings to support the sentence were so blended together that they could not be disassociated to the extent they were without pulling the understructure out from beneath the sentence. Moreover, the board of review could not compensate by a reduction in sentence for those findings it reversed, had it been prone to adopt that procedure. Under those circumstances, a rehearing by the court-martial was not only appropriate, but to my mind it was mandatory.

It is asserted that the board of review made an independent determination that this sentence was appropriate; that such a determination lies exclusively within the province of that board; and that, as such, that determination may not be reviewed by us. In the limited area where sentences become unalterable, I cannot accept that argument for two reasons. First, I am not certain the board of review was cognizant of the fact it had the power to grant a rehearing where the only vice in the record infested the sentence. The board of review may have concluded that, because the Secretary of the Department or the President could exercise powers of commutation, it was foreclosed from granting any relief. I do not believe, however, that Congress intended the military judicial system should be without power, in its own sphere, to correct an obvious miscarriage of justice even if it runs only to a sentence. In a fixed sentence, field corrective measures are nonexistent so that a rehearing must be considered as an appropriate method of correcting an obviously unfair sentence.

Second, if the board of review considered the possibility of granting a rehearing, but nevertheless concluded the sentence was appropriate and was uninfluenced by its lack of purging power, then, by my standards, it abused its discretion. So that I will make my point clear, I do not contend the approval of this sentence, in and of itself, would be beyond the power of the board of review. But what I do contend is that, having no power to change the type or nature of the sentence, and being precluded from making the punishment fit the crime, the board should have refused to pass on the appropriateness of the sentence until some military judicial body with the authority to consider all forms of sentence should have had an opportunity to fix a reasonable sentence. It is to be remembered that in this type of case the court-martial freezes the sentence into a package form which is untouchable until it passes from control of the military judicial channels to administrative sources. The only method of melting the solidity of the sentence is by starting the proceedings anew. When a sentence package, such as confronts us here, is passed to the board of review, it must accept or reject it in its entirety. Obviously, if

the findings remaining after the board of review has acted have any reasonable resemblance to the quantity and quality of those considered by the court-martial, then an acceptance of the sentence might be considered appropriate. But when what remains is but an insignificant part of the original, justice and a fair trial demand some tailoring of the punishment imposed by the court-martial. When, by law, the body with power to reverse findings is precluded from adjusting a sentence so as to make it appropriate to the conviction, one method of correcting the wrong is by the grant of a rehearing. Here the board of review chose not to follow that course which, under the peculiar facts of this case and the limitations placed on boards of review, is to me against logic, reason, and justice. The decision fails to disclose the exercise of a sound, legal discretion in the light of the entire record.

Many a reader will pause to wonder why I do not recommend that the case be returned to the board of review for further consideration of the sentence. If I am correct in my premise, to follow that course of proceedings would be futile. It may be that the board would grant a rehearing, but that leaves untouched the other possibility. If it were to again affirm the sentence, I would be compelled to hold it erred. With no more foundation than one relatively unimportant finding to support the decision, I do not believe life can be sustained in the present sentence. It needs the cure of a retrial and we can grant that without taking the unnecessary step of requiring action by the board of review. This does not mean that, if the case is retried and the same sentence imposed, the board of review or this Court must interfere. The extent to which I go is that the final sentence must be determined by some judicial body which is not shackled so tightly it does not have a free choice of an appropriate sentence.

I would, therefore, reverse the sentence and findings and grant a rehearing.

**544**

BROSMAN, Judge (dissenting):
I must dissent from the result reached by the majority.

## II

Uniqueness characterizes the case before us here. First, it is unique in its irony. The accused officer, a lieutenant colonel, was once a high functionary in the system of censorship imposed by the Eighth Army in Korea. Now he has been sentenced to dismissal for an alleged defiance of the very Regulations it had previously been his duty to enforce. His book, "Korean Tales," produced his present difficulties largely because of assertions contained in it to the effect that General MacArthur had been irresponsible in public statements while commanding the United Nations Far Eastern forces, and that certain elements of the press corps in Korea had been equally irresponsible in their reporting. Yet the alleged irresponsibility of the accused in publishing these evaluations constitutes the gravamen of the present proceedings against him. While in Korea, he served as president of a general court convened by the Commanding General, Eighth Army—and one of the chapters of "Korean Tales" treats at length of trials by court-martial. Ironically enough, however, he is now concerned with the receiving, rather than the dispensive, aspect of military justice.

Uniqueness also inheres in the circumstance that the instant one must be regarded as a test case. Repeatedly during the trial, defense counsel sought to present evidence to the effect that military persons other than the accused, and of a rank considerably higher than his own, had on numerous occasions issued public statements without prior submission to Army public information officers for clearance—and that no trials by court-martial had resulted. Quite properly the law officer excluded this evidence as immaterial.

I am sure that neither the court-martial, nor this Court, properly can question the Army's selection of Colonel Voorhees' conduct for experimental purposes. Cf. United States v. Messenger,

2 USCMA 21, 6 CMR 21. Nevertheless, I cannot ignore the fact that this *is* a test case, and that it falls within the very sensitive areas of free speech and free press—facts which to me imply a burden of extraordinary caution in this Court's review. Consistent with that duty, I find it impossible to affirm any of the findings of guilt here.

### III

Although the areas of free speech and free press are sensitive ones, it is undeniable that a military person, by virtue of his status as such, may become subject to the imposition of special limitations on the freedom with which he may express his personal views. This circumstance is no more than a facet of the proper principle that the pressing demands associated with the successful conduct of war may authorize limitations, even discriminations, otherwise illegal. Hirabayashi v. United States, 320 US 81, 87 L ed 1774, 63 S Ct 1375. Nonetheless, and even as to service personnel, I deem applicable to a partial—even a substantial—extent the doctrine of the Supreme Court that the rights deriving from the First Amendment to the Constitution are to be jealously safeguarded by the judiciary—this regardless of whether they may be said to enjoy a "preferred position." See, e.g., Thomas v. Collins, 323 US 516, 89 L ed 430, 65 S Ct 315; Schneider v. Irvington, 308 US 147, 84 L ed 155, 60 S Ct 153.

In the protection of these rights, the Supreme Court has inveighed particularly against "previous restraints" on free speech and a free press. This hostility to censorship—which normally seeks to silence the expression of unpopular views or opinions—was displayed vividly in Near v. Minnesota ex rel Olson, 283 US 697, 75 L ed 1357, 51 S Ct 625. There the Court overturned an injunction which purported to prohibit the defendant's publication of "malicious, scandalous and defamatory matter"—and it was emphasized that only in "exceptional cases" might previous restraints on publication be imposed. Cf. Lovell v. City of Griffin, 303 US 444, 82 L ed 949, 58 S Ct 666;

Cantwell v. Connecticut, 310 US 296, 84 L ed 1213, 60 S Ct 900. More recently, the Supreme Court reaffirmed the Near doctrine in striking down an attempt by New York censors to prohibit the showing of an allegedly sacrilegious motion picture. Burstyn v. Wilson, 343 US 495, 96 L ed 1098, 72 S Ct 777. Accord, Gelling v. Texas, 343 US 960, 96 L ed 1359; 72 S Ct 1002; Superior Films v. Ohio, 346 US 587, 98 L ed —, 74 S Ct 286. The Court there pointed out that, in connection with the application of the broad and all-inclusive definition of "sacrilege" utilized by the State in its picture censorship, "the censor is set adrift upon a boundless sea." In the Court's eyes New York labored under a "heavy burden" to demonstrate that its censorship involved the "exceptional case" adverted to in the Near opinion.

An identical approach was taken in considering the refusal by public officials to permit the use of public places for the dissemination of unpopular views by certain groups or individuals. Kunz v. New York, 340 US 290, 95 L ed 280, 71 S Ct 312; Niemotko v. Maryland, 340 US 268, 95 L ed 267, 71 S Ct 325. In the former case the Court considered contentions that denial of a permit to speak was justified because the individual who sought it might produce breaches of the peace by statements made in the course of religious meetings. It was emphasized that "there are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence." And it was added that "We are here concerned with suppression—not punishment." This latter remark displays unmistakably the view that censor- ship is not justified for the sole reason that a projected utterance might result in a breach of the peace, the maintenance of a nuisance, or some other punishable offense. The premise, of course, is that society will be protected sufficiently through the likelihood of subsequent punishment administered in accordance with due process of law; and that there would be involved a great loss of freedom—and the benefits thereof—if an individual

**545**

were to be subjected to the uncontrollable and unreviewable whims of a censor.

## IV

It strikes me that—despite differences between the military and civil situations—the Supreme Court opinions adverted to in preceding paragraphs possess definite relevance to the problem at hand. The prosecution of Colonel Voorhees stems from an effort to enforce the Army's system of censorship. This censorship was directed toward suppressing the publication of his book—which is to say, to the imposition of a "previous restraint" on the accused's expression of views. The censorship was in no way operative to protect *"security,"* but instead to enforce *"policy and propriety."* This fact is made abundantly clear in the record of trial, which contains testimony of prosecution witnesses to the effect that the accused's manuscript ran into trouble because of the author's failure to meet "policy and propriety" standards, and not because of threats posed to "security." In addition, General Dorn, the Army's Deputy Chief of Information, who actively conducted the review of the Voorhees manuscript, wrote the accused's publishers—as revealed by Defense Exhibit R—that security was *not* involved. Finally, a perusal of "Korean Tales" amply reveals the extent of unlikelihood that security *could* have been involved—in view of the very nature of the book.

The Army refused to grant clearance unless Colonel Voorhees effected substantial deletions. Had these deletions been accomplished—as General Dorn also wrote the publishers—the latter might well have been unwilling to publish the remnant. It is apparent that, in the absence of those deletions, the accused would never have been free to publish—so far as the Army was concerned—until that vague and uncertain day in the future when he would be released from active duty. At that time the manuscript unquestionably would have been "dead," in light of the topical character of its subject matter. Thus the choice presented the accused was one between the risk of disciplinary

action, on the one hand, and, on the other, the nonpublication of a book conceded by the Army to be unobjectionable security-wise. This was Colonel Voorhees' option as of a time considerably earlier than June 15, 1952—the date of the first alleged offense.

It is hard for me to understand how the phrase "policy and propriety"—although, as the Chief Judge says, it does not possess "simply the dictionary meaning"—is appreciably more definite than the term "sacrilegious." Cf. Winters v. New York, 333 US 507, 92 L ed 840, 68 S Ct 665; Lanzetta v. New Jersey, 306 US 451, 83 L ed 888, 59 S Ct 618. Moreover, I perceive no channel for legal review of determinations by the Army's Public Information Office of the question of what manuscripts do not conform to "policy and propriety," and thus are unpublishable. When such massive vagueness characterizes a statute promulgated to restrict free speech and press, I do not feel inclined to inquire into what behavior, within the vast area covered by its terms, may legally be interdicted. Cf. Winters v. New York, supra; Thornhill v. Alabama, 310 US 88, 84 L ed 1093, 60 S Ct 736; Cantwell v. Connecticut, supra; Schneider v. New Jersey, supra; United States v. Cardiff, 344 US 174, 97 L ed 200, 73 S Ct 189. Nor am I able to see how the Army can—under its application of AR–360–5—meet the "heavy burden," referred to by the Supreme Court, in justifying the "previous restraint" it seeks to impose on the accused.

It has been maintained by the service concerned that the publication of "Korean Tales" would have involved the commission of multiple offenses by the accused—notably that of disrespect to his superior officer, General MacArthur, in violation of the Uniform Code, Article 89, 50 USC § 683. Initially I must record my difficulty in discerning the possibility of any sort of offense growing out of many of the passages on the deletion of which the Army Public Information Office insisted. For example, one such passage asserted that certain reporters in Korea had been extremely competent; it also indicated that others had been decidedly incom-

546

petent, and had used questionable tactics in obtaining and disseminating news. Even within the ample folds of Article 134, is a criminal offense committed in praising a group of newspaper reporters? Or in condemning others— so long as the motive is not criminal and the condemnatory facts and language are not false?

However, were I to concede arguendo that the publication of each of the statements complained of by the service concerned did involve an offense under the Uniform Code, I would not be required to conclude that the censorship of such statements was lawful. The Supreme Court has said as much in Near v. Minnesota, supra, and as well in Burstyn v. Wilson, supra. That Court—it seems to me—has unhesitatingly refused to remit law enforcement to the untender mercies of censorship, and has asserted that the remedy lies in prosecutions for the offenses committed, rather than in the suppression of a book, an article, or a public address. Accordingly, any disrespect to General MacArthur could appropriately have been punished by a court-martial—with the determination of guilt left to an Army court operating within the framework of miliary due process and other safeguards provided by the Uniform Code of Military Justice. But "Korean Tales" could not lawfully be suppressed by service censors, acting within the terms of their own understanding of the nebulous phrase, "policy and propriety." As for the possibility of insults to the press, I suspect the remedy would lie principally in civil suits for libel against the accused and his publishers—on the assumption, of course, that any reporters concerned could establish the untruth of Colonel Voorhees' comments relating to themselves.

Judge Latimer suggests the possibility of "chaotic conditions" unless censors are permitted to delete statements which might invade Army concepts of "policy and propriety." He suggests, indeed, that it is an undue burden to require prosecutions for disrespect and the like instead of permitting the censorship of offending statements in the first place. His supposition of disorganization does not serve to justify in my

mind the vagueness and concomitant chaos which currently appear to infest the Army's system of censorship. Moreover, if offenses in the nature of disrespect to a superior officer tend to multiply dangerously, a remedy more consistent with the rights of free speech and press might take the form of an increase in the punishment assessable for the crime—a measure which the President is empowered to take when he feels necessary. It is genuinely hard to believe that the deterrent effect of action of this sort would not suffice to stiffen discipline. Civilian analogies certainly suggest that it would. Yet the action would in no wise require the imposition of "prior restraints"—branded as odious by the Supreme Court.

Judge Latimer at another point indicates that Congress, in enacting Article 88 of the Code, which prohibits contemptuous statements by a commissioned officer against enumerated public officials, wished to preclude "unbridled expressions of opinions by service personnel." The argument that an express prohibition of one type of behavior implies an intent to forbid all generally similar conduct not only flies in the face of the ancient canon of construction, *expressio unius, exclusio alterius,* but also defies the previous decisions of this Court. United States v. Norris, 2 USCMA 236, 8 CMR 36; United States v. Hallett, 4 USCMA 378, 15 CMR 378; United States v. Hamilton, 4 USCMA 383, 15 CMR 383.

Additionally this same associate quotes from Schenck v. United States, 249 US 47, to support his argument. However, that case involved a World War I prosecution for the distribution of leaflets which counselled opposition to the conscription program then in effect. This distribution violated specific statutes enacted by Congress on which the indictment rested—legislation involving no such nebulous phrase as "policy and propriety." Most important, no attempt was there made to impose a "prior restraint." In fact, as the very quotation from the case indicates, the absence of such restraints constituted one of the grounds on which the Government sought to sustain the conviction. Likewise I would find no

**547**

valid constitutional objection here were Colonel Voorhees being prosecuted—not for a failure to accede to "prior restraints"—but for past violations of some one of those enactments, found in the Uniform Code and elsewhere designed to maintain military discipline and efficiency. Balancing, on the one hand, the Congressionally authorized deterrents available for conduct which undermines discipline against the amorphism of the Army's censorship, on the other, I cannot descry the overriding necessity that *I* would require to sustain the legality of the restrictions the latter imposes. Nor can I find any circumstance which would induce me to attempt by judicial construction to rewrite the offending Army Regulations in order that they may be made to conform to law.

Government counsel have urged that the Army's Public Information Office would have aided and abetted in the commission of crime by the accused had it cleared his manuscript—containing as it did disrespectful references to General MacArthur. The simple answer to this argument is that if the censors lacked authority to review other than for security—which was found not to be involved in the manuscript of "Korean Tales"—they could not be criticized for failure to act beyond their powers. On this premise, their clearance would have reflected no more than the representation that the book presented no security problem—which is indisputably the case—and thus could have established no criminal participation on the part of censorship personnel.[2]

V

Chief Judge Quinn has taken the view that AR–360–5 does not, in fact, authorize censorship either for "policy" or for "propriety"—with the unquestioned result that these Regulations do not touch legal limita-

tions on the Army's authority to regulate the free speech of its personnel. To me, this interpretation seems as unique as certain other aspects of the present case. I observe that the Forrestal Memorandum of March 17, 1949, authorized review for "security, policy and propriety." Although I were to adopt the Chief Judge's notion that the words "policy and propriety" do not possess "simply the dictionary° meaning," it is undeniable that they were not used in the Memorandum as synonyms for "security." In the first place, and in terms of normal meaning content, they are not at all synonymous— and in the second, there would have been no point (even in a Government directive) in the use of three words to do the work of one.

On June 7, 1949, Secretary Johnson, of the Department of Defense, issued a further Memorandum which provided that the responsibility of public information officers—including those of the top echelon—"for the review of manuscripts or other material . . . is limited to deletion of matter which is classified for security reasons." Seemingly, this Memorandum had sounded the death knell for "policy and propriety" review. Yet on October 20, 1950, the Army promulgated AR–360–5, which resurrected those terms and that sort of review. Paragraph 13*a* of those Regulations provides that the preparation of books, articles, and the like, is authorized "within the bounds of security and Department of the Army policy." Thus, it might be concluded that beyond those bounds such writings are not authorized. And this conclusion is reinforced by the provision in paragraph 15*b*, directing public information officers to "review for accuracy, propriety, and conformance to policy." That these terms are not synonymous with "security" is deducible from the distinction made in paragraph 15*c* of the Regulations which requires Army

[2] If the Army does not censor the public writing of its personnel to determine policy and propriety, it would be hard to view that service as being in any way bound by what the individual says. On the other hand, if it does censor everything stated publicly by its

personnel, to determine conformity to Army "policy," it might be argued that anything said in public by a serviceman constituted an expression of official views. I doubt that the Army would desire this consequence. No objection would exist in my mind to requiring

civilian personnel to submit material for review "when there is any doubt concerning its security *or* propriety." (Emphasis supplied.)

Since the Johnson Memorandum was unrevoked at the time of its promulgation, any doubt that AR–360–5 was born in illegality is dispelled by the construction given the Regulations by the persons charged with their administration. I have always tended to accord considerable weight to the interpretation placed on Regulations by the enforcement agency. Billings v. Truesdell, 321 US 542, 88 L ed 917, 64 S Ct 737; United States v. Jackson, 280 US 183, 74 L ed 361, 50 S Ct 143; Stout v. Hancock, 146 F2d 741 (CA 4th Cir), cert den 325 US 850, 89 L ed 1971, 65 S Ct 1086. Particularly would this approach seem appropriate to a situation in which the persons charged with *administering* the directive are the very ones who *drafted* it. In the present case these individuals were—in both instances—the personnel of the Army Public Information Office. The sworn testimony of General Parks, the Chief of Information, and of his Deputy, General Dorn—both prosecution witnesses and both unrefuted on the point— was to the effect that AR–360–5 was drafted under the auspices of the Public Information Office.

General Parks admitted specifically that AR–360–5 "is not consonant with" the Johnson Memorandum. He explained that the Army had set up a review agency of its own for the purpose of dealing with manuscripts and other statements "because there is propriety involved in many articles, and accuracy, and the Secretary of Defense's Review Board does not go into those things. Somebody had to do it and we do it." Later General Parks reiterated that the people of the Security Review Board of the Defense Department "have

based their review solely on security, that is, classified material." From this it is reasonably inferable that the *raison d'etre* of the Army's Review Branch was the accomplishment of review unauthorized by the Johnson Memorandum—with the limits of which Memorandum, on the other hand, the Defense Department Security Review Board complied meticulously.

General Dorn too recognized explicitly the sharp inconsistency between AR–360–5 and the Johnson Memorandum. His explanation simply was that the Regulations were promulgated under the authority of the Truman Directive of December 5, 1950. There is considerable doubt—as Judge Latimer makes clear—that this last directive has any sort of applicability to the immediate area with which we are concerned. In any event, General Dorn's attempted explanation distinctly involves the assumption of clairvoyance on the Army's part—since AR–360–5 was published on October 5, 1950.[3] Colonel Edgerton, Chief of the Defense Department Security Review Board, also admitted that when AR–360–5 appeared, he had "informally" raised the question of whether it must not be deemed to conflict with the Johnson Memorandum.

Although—like the Chief Judge—I were able to reject the testimony of prosecution witnesses to the effect that AR–360–5 is so broad as to conflict with the Johnson Memorandum, I do not see that my conclusion need be altered. Under such a view, the greatest variation would simply involve the substitution of legal Regulations, with illegal censorship taking place thereunder, for Regulations themselves illegal. Personally, however, I feel no slightest inclination to charge the Army Public Information Office with a disregard of the intent of AR–360–5—

---

that any statement made by service personnel be prefaced by a disclaimer that the statement does not represent an official view, unless the individual has properly submitted it for approval by the appropriate public information office.

[3] Another equally extraordinary explanation offered at the trial by the

Government was that the Secretary of the Army, as the agent of the Secretary of Defense, was impliedly authorized to issue *any* directive he thought necessary and proper, although it conflicted with those of his superior. For obvious reasons this rationalization is also untenable.

drafted in that very Office—and with an arrogation of powers not conferred by those Regulations. Yet this is the logical consequence of Judge Quinn's interpretation—for it is clear that by their own admission, functionaries of the Army Public Information Office censored Colonel Voorhees' manuscript for "policy and propriety," in at least some sense of those loose and unexacting words. If this action was not authorized by, and in fact exceeded, AR–360–5—as he concludes—then a flagrant violation of these Regulations was committed by the Public Information Office. For my part, I consider that the Regulations themselves were illegal and that the Public Information Office acted in good faith in seeking to comply with an ultra vires directive emanating ultimately from the Secretary of the Army. Yet the censorship here is just as real—and just as illegal—regardless of whether it derives from an ultra vires Army directive or from the totally unauthorized action of Army personnel.

## VI

The only findings of guilty deemed free from error by the board of review—and a majority of this Court—relate to the Additional Charge that accused had submitted two articles to the New York Journal-American in December 1952, in violation of AR–360–5. The wholly incidental character of that Additional Charge is demonstrated beyond peradventure by the evidence. In the first place, the articles were at no time published—for the reason that the accused was unwilling to proceed with publication in the absence of approval by the Public Information Office. Second, there would seem to be some question of whether the manuscripts concerned had been "submitted" within the meaning of the Regulation. Mr. Richards, the prosecution witness by whom the Government sought to show submission, asserted that he did not regard them as having been "submitted."

The articles themselves constituted brief and general discussions of problems then current—articles which Colonel Voorhees had written at Richards' instance. It appears that Rich-

ards and the accused had agreed that the articles would not be regarded as "publishable" until Pentagon clearance had been obtained for them—an arrangement attested by the circumstance that they never in fact appeared in print. Under my interpretation of "submission," as used in AR–360–5, I would tend to doubt that the evidence established a violation of the Regulations—and the Article 32 investigator, I observe, concluded that the manuscripts had not been "submitted." The law officer appears to have entertained a contrary view, although he did not choose to advise court members of what was required to show "submission." In any event, the existence of the agreement between Richards and the accused to the effect that publication would be withheld until clearance makes of the offense, if such it was, a very minor one indeed.

I must say that, after examining the two manuscripts, I can see nothing in either of them which conceivably could either endanger American security or transgress national policy. One of them was prefaced by a quotation from Secretary of State Dulles and sought to indicate agreement on the part of the accused with the Dulles view that Americans should practice "human fellowship." I find it impossible to discern anything objectionable in it, even if the statement from that article quoted in the Chief Judge's opinion be considered—as it was there—quite out of context. The second paper purported to expand a statement by President Eisenhower, with which it too was prefaced. Judge Quinn speaks of a "concise analysis of the Eighth Army," which is said to appear in this article. This analysis—I must confess—is so "concise" that, after reading it, I have little idea of my brother's meaning.

The incidental and minor nature of the Additional Charge—on which rested the only findings of guilt my brothers deem free from error—demonstrates the eminent soundness of Judge Latimer's position that the sentence to dismissal should not be approved. Like him, I entertain little doubt that the court's sentence to dismissal was influenced in large part by other findings held by a

majority—both here and in the board of review—to have been tainted with error. It is even conceivable to me that the findings themselves under this Additional Charge were substantially influenced by evidence relating to other Charges. Cf. Manual for Courts-Martial, paragraph 138*g*.

Examining both Additional Charges having to do with the Journal-American articles against the background of previous transactions, I feel convinced that they would never have been preferred save for the events which gave rise to the original ones. Justice—and this Court—would be more blind than is often assumed were we to ignore the circumstance that in filing them the Army was employing a "shotgun" technique. The premise of this technique—not hitherto unknown—is that, if enough charges are filed relating to the same transaction, or merely to the same accused, it is possible that: (1) the accumulation of damaging evidence will lead the court-martial to find the accused guilty "across the board"; (2) a heavy sentence will be imposed by the court; and (3) although some findings are disapproved on review, the sentence may yet be affirmed on the basis of those which are approved. In the instant case the use of the Army "shotgun" is made painfully obvious by the factual weaknesses and minor nature of the Additional Charges. Presumably it was for this reason that the Article 32 investigator recommended *against* trial thereon and commented *inter alia:* "It is believed that the two additional charges, if prosecuted, would tend to weaken the case in which charges have previously been filed against Lt Col Voorhees."

## VII

As I understand the majority's action, its members order a rehearing under the Additional Charge having to do with the submission of articles to the Journal-American and dismiss all others. In view of the intertwining of them all, I would go further and dismiss all. There are at least two precedents supporting our dismissal of charges—as an alternative to the direction of a rehearing—in a situation where the trial was replete with error. United States v. James, 1 USCMA 379, 3 CMR 113; United States v. Perna, 1 USCMA 438, 4 CMR 30. I find no difficulty in extending this principle to a case like the present—one where the trial was contaminated not by procedural error, but by an attempt to sustain an unwarranted and illegal censorship.

Court action becomes illegal when it is used as an instrument for the achievement of condemned ends. Thus, the United States Supreme Court held that the enforcement of a racially restrictive covenant by a state court constituted a violation of "due process" within the purview of the Fourteenth Amendment. Shelley v. Kraemer, 334 US 1, 92 L ed 1161, 68 S Ct 836. Within the meaning of such a Supreme Court decision, the conduct of the court-martial here represents official action which tended to put a new sanction behind illegal censorship. Were we to follow the example of the board of review, and to leave the sentence to dismissal intact, we would, I believe, be acquiescing in, and thereby encouraging, illegal censorship by the Army. Any member of the service concerned might then readily draw the moral that it does not pay to protest against illegal censorship, and that the safe course is to accept with equanimity the loss of fundamental rights. Unfortunately, my brothers' opinions, and their result, do not preclude the drawing of this same inference. On the contrary, they subject the accused to the expense, the hazards, and the inconvenience of a retrial on an Additional Charge which, to speak charitably, is minor in nature, and which in all likelihood owes its existence to Colonel Voorhees' refusal to permit the illegal censorship of "Korean Tales" for "propriety and policy." The Supreme Court's zeal in blocking the use of court action for unlawful ends suggests to me that in like manner we should not permit retrial under the Additional Charge to become a vehicle for the Army's purpose to punish Colonel Voorhees for failing to accede to its unlawful "policy and propriety" censorship.

Quite recently, in Barrows v. Jackson, 346 US 249, 97 L ed 1586, 73 S Ct 1031,

there was dismissed an action for damages for breach of contract brought against a vendor who had sold realty in violation of a racially restrictive covenant. It was there deemed unimportant that the respondent—who interposed the defense of unenforcibility—was not himself a member of the racial minority against which the convenant ran, the Court reasoning that:

". . . To compel respondent to respond in damages would be for the State to punish her for her failure to perform her covenant to continue to discriminate against non-Caucasians in the use of her property. The result of that sanction by the State would be to encourage the use of restrictive covenants. To that extent, the State would act to put its sanction behind the covenants. If the State may thus punish respondent for her failure to carry out her covenant, she is coerced to continue to use her property in a discriminatory manner, which in essence is the purpose of the covenant."

In that case a respondent was allowed the benefit of a defense which was predicated on the protection of the rights of a minority—and yet the defendant was not a member of that group. Here Colonel Voorhees is protesting the violation of his own rights. Consequently I scarcely feel that dismissal of the Additional Charge can be deemed to constitute unearned increment—an unprecedented windfall—as to him. However, even if he were the beneficiary of such a windfall, I would consider this far less important than the converse possibility. By permitting a rehearing we would—in my view—be encouraging an illegal enterprise on the part of the Army; would be punishing Colonel Voorhees for refusing to accede thereto; and would be coercing other service personnel to relinquish their rights in the future. In fact, failure to dismiss all of the Charges here is distinctly incongruous in light of the solicitude with which this Court has protected numerous rights which, in my eyes, are of infinitely less importance than those of free speech and a free press.

VIII

In paragraph 15c, AR–360–5 directs

552

that "Personnel on active duty will submit their writing and public statements to the appropriate security review authority." In my view this requirement was intended to embrace all writings and statements designed for public release. Judge Latimer, on the contrary, denies that "matters of a nonmilitary nature which have nothing to do with the armed services need be submitted for accuracy, propriety and conformance to policy." I observe that paragraph 15c, which he quotes in his opinion, provides that retired personnel and civilian employees will submit their writings "when the material concerns military subjects." Similarly civilian component personnel are enjoined to submit material "which concerns military subjects." The area of "military subjects" conforms roughly to the area to which Judge Latimer says the requirement of submission is limited. Since in two instances AR–360–5 specifically restricts the requirement of submission to writings in that area, yet in another—dealt with in the same paragraph—omits mention of any such restriction, I must conclude that the latter area is not subject to any such limitation.

Here again I am aided by Army administrative interpretations—since the functionaries of the Public Information Office certainly took an all-embracing view of the matter. General Parks stated that—under the construction of his office—anything written by an Army officer on active duty must be reviewed for accuracy, propriety and conformance to policy. In answer to a specific —and colorful—question, he stated in testimony that one on active duty would be required to submit for review even a manuscript entitled "The Love Life of a Texas Rattlesnake." General Dorn took an identical view, even as to the mentioned example. Major Pizer originally offered the same broad interpretation. Subsequently, however, on recall, he proffered a narrower interpretation —and, when referred to his prior testimony, indicated that he did not recall what he had said earlier. Finally the Major conceded that under AR–360–5 anything written by an officer on active

duty "could be required to be submitted."

The inclusiveness of this requirement of submission—as I interpret that injunction—dovetails with my construction of AR–360–5 to authorize review for "policy and propriety," and not alone for "security." The area encompassed by statements which might conceivably touch on "policy and propriety"—as those terms are generously applied in the Army Public Information Office—is almost limitless. Thus, it would be not at all inconsistent to require the submission and examination of *everything* written for public release by a person on active duty. Indeed, to effectuate such a policy and propriety censorship such a view would seem to be downright necessary. For example, a writing or statement may be obscene, and thus violate "propriety"; it may be critical of someone—apparently almost *anyone* would suffice—and thus violate "policy"; or it might contain technical inaccuracies, and thus reflect indirectly on the Army, thereby violating the apparent "policy" of the Public Information Office to reject publication of all items which do not serve to raise that service in public esteem.

On the other hand, the area of security, broad as it may be, is markedly more limited—and review for security might with much logic be thought to demand only that certain categories of public statements be submitted for clearance. For instance, it might justifiably be deemed unnecessary to require preliminary screening of a chaplain's sermon or a medical treatise for this purpose.[4] Or it might be regarded as appropriate to limit the screening of public papers or utterances to those emanating from persons connected with "highly classified projects or agencies in which highly classified information is processed." Cf. AR–360–5, paragraph 15e. My point simply is that the requirement of submission, in all its vastness, may well have been geared to the facilitation of censorship for *policy and propriety*, and may *not* have been considered by the draftsmen of AR–360–5

as required by security review. As a matter of plain intendment, this requirement of submission of *all* manuscripts must—it seems to me—be linked to review for policy and propriety. Therefore, as a matter of constructional inseparability, I would regard it as appropriate to say that the requirement of submission, as it currently stands, may not serve as a basis for prosecution.

Moreover, I deem the application of the clearance requirement to all manuscripts and public statements to fly squarely in the face of the policy of the Johnson Memorandum, and even perhaps of the later Truman Memorandum. The former attempts to eliminate one area of previous review—and thereby to facilitate the free and ready flow of information to the public. The other recites that it does not purpose "to curtail the flow of information to the American people," and thus by negative implication recognizes the policy of fostering that flow. But what sort of free dissemination is possible if every proposed public statement of every person —regardless of connection in subject or content with military security, or even with military matters—must pass through the hands of an Army censor— perhaps to languish on his desk for months, as did Colonel Voorhees' manuscript, while the censor ponders moodily on "policy and propriety"? The submission requirement in AR–360–5, as interpreted and applied by the Army, constitutes nothing less than a distinct impediment to the flow of information to the American people, and thus contravenes the policy set by the Secretary of Defense and the President. Therefore, it must fall. And I do not propose to pick up the pieces through some feat of interpretative legerdemain.

The inconsistency of AR–360–5 with directives from superior authority is made more apparent under the Army's —and my own—construction of the submission requirement than under Judge Latimer's. But even under his, I am sure that sufficient inconsistency exists

---

[4] Similarly it might be thought unnecessary to require preliminary clearance of books like "The Dorn Cook Book" recently published by General Dorn, the Army's Deputy Chief of Information, who testified as a prosecu-

to warrant striking down that portion of the Regulations.[5] And I do not see how he can meet the argument that—as a matter of strict service intendment—

it is entirely possible that the requirement of submission meshes too closely with the unlawful purpose to censor for "policy and propriety" to warrant any

---

tion witness. No stretch of the imagination could relate such a tome to "security."

[5] If Judge Latimer's interpretation is correct that only public statements on military subjects must be submitted for clearance prior to release, then an additional error tainted the findings as to three of the specifications found on the Charge Sheet, which alleged merely that the accused violated paragraph 15, AR–360–5 "by knowingly submitting" a manuscript on a certain date to a named publisher. The defense, from the outset, objected to these specifications—on the ground that their allegations encompassed the submission of *every* projected article or public statement, and not merely those which might conceivably relate to military security and the like. As revealed in Appellate Exhibit 1, trial counsel took the opposed position that *any* manuscript must be submitted regardless of content. The law officer clarified this Government attitude by a specific question:

"LO: Then I take it the prosecution's theory of the case is that any writing written by an accused was required to be submitted for Army clearance before publication?

"TC: As far as this AR–360–5 in and of itself is concerned."

On the basis of this explanation of the Government's position, the law officer overruled the defense objection that the three specifications improperly failed to allege that Colonel Voorhees' manuscripts dealt with military subjects.

As the trial progressed, the law officer seems to have reconsidered the difficulties inherent in the Army's broad assertion of power over all projected manuscripts and public statements. Thereupon he announced—as reflected in Appellate Exhibit 20—"I am seriously reconsidering whether I did not commit legal error in denying all of the motions." Later during the same hearing, he commented "I am informing both of you gentlemen that I think I committed legal error in denying the motions."

At the instructional stage the law officer attempted to cure whatever error derived from the inclusive nature of the specification—and supplied an extremely narrow construction of AR–360–5 with

respect to the classes of manuscripts requiring submission for review. If, however, AR–360–5 does not require submission of all manuscripts I am inclined to believe that the law officer's action came too late to avoid prejudice to the accused from the overruling of the defense objection to the specifications as drawn. Certainly the wording of paragraph 15 of AR–360–5 affords no clear notion of any sort of limitation on the character of manuscripts included; and the specification went no further than the Regulations. Indeed, the entire case was tried on the theory—inherent in the pleadings—that *all* public writings and statements must be submitted for review. Of course, the presentation of evidence and argument by the defense was conditioned on the pleadings, and so on the Government's theory of the case. There was simply no point in offering testimony or argument concerning the nature of the manuscripts by Colonel Voorhees, since the premise on which the trial proceeded was that the nature of the articles was immaterial to guilt or innocence. If that premise was incorrect, then I must conclude that the law officer prejudiced the accused in failing to sustain objections to the three specifications which dealt with the knowing submission of manuscripts to publishers. That error would—it seems to me—have special impact as to the specification charging the submission of articles in December 1952 to the Journal-American. Those articles were almost completely dissevered from any possible "security" criterion, and could scarcely have been objectionable in the sphere of policy—for they attempted no more than to support the wisdom and feasibility of statements made by President Eisenhower and Secretary of State Dulles. These latter statements, I feel sure, have not been disavowed by either of these high officials. Yet until the moment the law officer instructed—of course at a late stage of the trial—the court-martial was necessarily proceeding on the assumption that Colonel Voorhees would have been guilty although the two articles had dealt solely with the amours of a Texas rattler. Unless the assumption is correct, I cannot see that reversible error was not present.

sort of attempt by us to disentangle some possibly legal requirement of submission from the illicit effort to delete material unobjectionable security-wise. Certainly he does not do so by means of his mechanical two-from-three-leaves-one approach. Indeed, if two of three bales of goods are jettisoned, *none* remains if the third is roped to the pair thrust overboard. Thus here, a denial of (1) policy and (2) propriety does not at all leave us with (3) security—if a nexus exists between the three. But does such a link appear? Since that is a matter for primary Army consideration, genuinely, I do not know. But does Judge Latimer? Then why does he not eschew judicial legislation and permit the Army—the source of the Regulations—to express its purpose? True, it might desire—as Judge Latimer believes—to require a submission of *all* manuscripts concerning military subjects for security clearance. But then again it might desire to limit the requirement in some manner or other—in light of its inability to censor on the basis of undefined policy and propriety. I cannot know this—and neither can my colleague. Thus, even under his interpretation, I do not believe that the Additional Charge on which a rehearing has been ordered should be considered a legal one.

## IX

Several conclusions appropriate in the present setting should be stated specifically before this memorandum ends. (1) To my mind, Army review for policy and propriety is strictly forbidden by the Johnson Memorandum, and possibly is in conflict with the later Truman Memorandum. (2) Quite apart from these Memoranda, "prior restraints" based on unrestricted policy and propriety considerations are inconsistent with the law of the United States Supreme Court. No one is more aware than I of the need for a selective hand in the application of civilian precedents to the solution of problems in the military scene. Here, however, and on balance, I find no need for distinction. (3) On the contrary, an exercise of the same process of weighing and balancing causes me to conclude that "prior restraints" must not be considered odious in the area of security, and their employment in that sphere may not be said to be unlawful as such. (4) Conceding arguendo an absence of inconsistency with the spirit of the Johnson and Truman Memoranda, I would not be inclined to hold it beyond the power of the Army—if it wished to do so—to require the submission for security review of *all* public statements of military personnel. (5) On the other hand, I cannot deny the possibility that this, or any other service, might elect not to provide for review of *every* such statement in *every* situation and from *every* military person. (6) Because of the close interrelation of security, on the one side, and policy and propriety, on the other, in the wording of the Regulations under consideration—and for other reasons mentioned earlier in this opinion—I do not find in AR-360-5 a clear mandate directing judicial severance of the demand for submission of material for security clearance from the requirement that public statements be submitted to facilitate an illegal policy and propriety clearance. Genuinely, I do not feel that the Army will be unduly burdened by my notion that in drafting censorship regulations it must proceed with a certain amount of specificity. Pretermitting any question of security, I will be no party to a "gag rule" on military personnel—one by which their public utterances are subjected to the whims of a censor who is without statutory guidance and quite beyond review. Those utterances deemed harmful to military discipline have been the subject of legislative proscription by Congress. The maximum punishment for violations of such enactments is by and large within the President's discretion—with the result that the deterrent may be adjusted readily to current demands. Security infractions too are the subject both of Federal punitive legislation, applicable to servicemen, and of valid Army regulations. See United States v. Grow, supra. Should these alternatives not suffice, it is clearly open to the Army to consider applicable precedents, and thereafter to redraft AR-360-5 to eliminate its vagueness and to confine its scope to justifiable goals.

In light of the foregoing—while con-

curring in my brother's reversal of the findings and, as I understand it, their dismissal of four specifications—I am compelled to go further than they and to vote to dismiss the single remaining Charge and specification. As a practical matter, I doubt that we are very far apart.